Bub SNOW, d/b/a BUB SNOW DRILLING COMPANY
v. C.I.T. CORPORATION OF THE SOUTH, INC. et al

82-232                                    647 S.W.2d 465

Supreme Court of Arkansas
Opinion delivered March 14, 1983

*Meadows & Elcan,* by: *Frank C. Elcan, II* and *Steven Davis,* for appellant.

*Hesikell, Donelson, Bearman, Adams, Williams & Kirsch* and *Wright, Lindsey & Jennings,* for appellee C.I.T. Corporation of the South, Inc.

*Richard L. Peel,* for Tennessee Well Co. and Southeastern Drilling Supply Co.

*Friday, Eldredge & Clark,* by: *George Pike, Jr.,* for appellee Schramm, Inc.

GEORGE ROSE SMITH, Justice. In January, 1980, the appellant Snow, engaged in the business of drilling water wells, purchased a drilling rig under an installment contract reciting a cash price of $283,500 and finance charges of $118,786.20, the total being payable in 60 equal monthly installments. Snow had difficulties with the rig's performance from the outset. Two months after the purchase Snow had his attorney send a letter to the sellers electing to revoke his acceptance of the rig and demanding the return of his $40,228.62 down payment. The sellers refused to recognize Snow's right to revoke his acceptance. On April 1 Snow brought this suit in equity to obtain revocation of the sale, recovery of the down payment, and substantial damages for loss of profits during the two months he used the rig.

After an extended trial the chancellor held that the contract was not usurious as charged, that Snow was not entitled to revoke his acceptance, that Snow's $10,000 note for part of the down payment should be canceled, that Snow should recover $6,015 for breach of the implied warranty of merchantability, and that Snow is liable for a deficiency judgment of $62,293.89 resulting from a sale of the rig during the pendency of the case. We can best state the pertinent facts as we discuss the points argued on direct and cross appeal.

Snow first argues that the contract, embracing an interest rate of more than 10%, was usurious because the recitation that it was to be governed by Georgia law was a subterfuge to avoid Arkansas usury laws.

We find no merit in this argument. The Uniform Commercial Code provides that when a transaction bears a reasonable relationship to the particular enacting state and also to another state, the parties may agree that the law of either state shall govern. Ark. Stat. Ann. § 85-1-105 (1) (Add. 1961). Here four states were directly involved: Arkansas, where the contract of sale was negotiated between Jack Wilkes, the president of an Arkansas drilling supply company, and Snow, a resident of Everton, Arkansas; Tennessee, where the actual seller, Tennessee Well Supply Company, a dealer, had the rig for sale, and where Snow and Wilkes went to sign the contract documents; Georgia, where the finance company, C.I.T. Corporation, had its principal office and completed the sale by signing the documents; and Kansas, where the rig was delivered and used by Snow as best he could before he sought revocation of his acceptance.

The whole transaction was contingent upon C.I.T.'s willingness to finance it. C.I.T. insisted that the contract be governed by Georgia law, a provision that in C.I.T.'s words was "not negotiable." All the parties agreed to it. With the transaction having a direct connection with four states, we cannot say that the choice of Georgia law was not a reasonable one. We may refer to our discussion in *Cooper* v. *Cherokee Village Develop. Co.*, 236 Ark. 37, 364 S.W.2d 158 (1963), where, as here, we found that the selection of another state's law was not a cloak to avoid Arkansas's usury laws.

We must, however, sustain Snow's principal argument, that the chancellor was mistaken in refusing to give effect to Snow's revocation of his acceptance of the rig. In reaching his conclusion the chancellor relied, in part, upon Snow's failure to tender the return of the rig when he filed his complaint and his continued refusal to return 1,500 feet of pipe and other accessories, valued at a total of $47,485.

A tender of goods purchased was a condition to the right of rescission under our earlier law, but the Uniform Commercial Code dropped that requirement. We quote from one treatise on the Code:

> A tender of the goods by the buyer to the seller is not an essential element of revocation. All that is required by the Code is a notification of revocation. The Code declares that notification is not effective until notice is given and by necessary implication states that there is a sufficient revocation of acceptance when a "notice" is given even though the buyer still has possession of the goods and even though he does not make any tender of the goods to the seller. The concept of revocation of acceptance is not to be confused with rescission.
>
> &ast; &ast; &ast; &ast; &ast;
>
> If the buyer has paid for the goods in advance or has incurred any expense or damages for which the seller is liable, the buyer, upon making a rightful revocation of acceptance is entitled to hold the goods until he has been paid. That is, the Code in such a case gives the buyer a security interest in the goods.

Anderson, Uniform Commercial Code, § 2-608.18 (2d ed. 1971); Ark. Stat. Ann. § 85-2-608.

The chancellor's alternative and principal ground for his decision was that the defects in the rig were not sufficient to substantially impair its value to Snow, as required by the Code. § 85-2-608 (1). The decree denied revocation but awarded Snow $6,015 as damages for breach of the implied warranty of merchantability.

We cannot agree with the chancellor's decision. When Snow bought this rig, a model T685, he already had a model T64, also manufactured by the appellee Schramm, Inc., brought into the case by Tennessee Well Supply as a third-party defendant. During the negotiations Wilkes represented that the later model was superior to the older T64. This did not prove to be true.

Snow and his wife, who worked with him in the business, thought the new rig was idle for 46 days between its delivery on January 15 and the notice of revocation on March 11. Snow testified that the T64 would drill a 1200-foot hole in a day and a half, but he drilled only six holes with the T685 while he tried to use it. Not only did it drill too slowly, it was continually down for necessary repairs. We make no effort to describe all the defects, which were usually referred to by the witnesses in terms too technical for our comprehension. Snow's testimony was corroborated by that of others in the same business who had used both models. Wilkes showed that he sent his repairman to work on the rig when Snow complained, but the repairs were evidently not effective. It is apparent that neither Wilkes nor Tennessee Well Supply brought the complaints to the attention of Schramm, the manufacturer.

The really decisive testimony is that of Schramm's expert repairman, Dante DeCecco, who certainly knew more about the rigs than any other witness. DeCecco did not see the T685 in question until it was surrendered in October, 1980, and taken to Wilkes's place of business for repair. There DeCecco spent a week modifying and repairing the rig. He testified that after the T685's were first marketed the manufacturer found that major modifications were needed. One such modification came out in October, 1979, but it was not on the rig sold to Snow the following January. Here are excerpts from the abstract of DeCecco's testimony:

> The majority of the work I have done on T685's in the last year has been warranty work. The T685 requires five or six major modifications or engineering changes. These changes were not made on Mr. Snow's rig until October, 1980. All my modifications on these 50 rigs [mentioned earlier] have been essentially the same. I have been more or less isolated to the T685 changes in the last year and a half. . . . Mr. Snow's rig would have had to be down for about a week to make the modifications that had to do with operational efficiency.

DeCecco also testified that it is the dealer's responsi-

bility to notify Schramm when a customer complains. He said he would have come out and spent a week making the repairs to Snow's rig if the dealer or Snow had called him, but no one did. We conclude that it is shown by the record as a whole, and especially by the testimony of the manufacturer's own employee, that Snow was entitled to revoke his acceptance of the rig because its non-conformity substantially impaired its value to him.

Snow also argues that the chancellor was wrong in finding that Snow's claim for lost profits had not been proved sufficiently. Our rule is that such a loss must be established with reasonable certainty. *Robertson* v. *Ceola*, 255 Ark. 703, 501 S.W.2d 764 (1973). Here the claim rested largely upon the testimony of interested witnesses, Snow and his wife. The chancellor was in a far better position than we are to weigh their testimony. There was a significant absence of documentary proof of past profits made from the successful drilling of wells similar to those Snow says he would have drilled had the rig functioned properly. Moreover, the plaintiff's burden was to prove consequential damages "which could not reasonably be prevented." § 85-2-715. During the two months in question Snow could have used his T64; he offered scant explanation of why that was not done. In our opinion the failure to use the other rig was not a matter of mitigating damages already established but rather one of reasonably minimizing the loss in the first place. As pointed out in paragraph 3 of the Comment to § 85-2-715, the earlier rule is modified "by requiring first that the buyer attempt to minimize his damages in good faith." We do not find the chancellor's denial of lost profits to be clearly against the preponderance of the evidence.

Both Tennessee Well Supply and Schramm have cross-appealed from the award of $6,015 for breach of warranty, but since our holding supersedes that award those points are moot. Tennessee Well Supply also cross-appeals from the trial court's cancellation of Snow's $10,000 note on the ground that Tennessee Well Supply was an unlicensed foreign corporation doing business in Arkansas when Snow executed the note in Arkansas at Wilkes's request. Tennessee Well Supply's president testified that his company had done

some business in Arkansas for a few years before 1980; so the chancellor's ruling was correct under the Wingo Act. Ark. Stat. Ann. § 64-1202 (Repl. 1980).

Reversed and remanded for the entry of a decree giving effect to Snow's revocation of his acceptance as against Tennessee Well Supply, directing the return of his down payment, charging him with the $47,485 value of the articles he has not returned, and disposing of other remaining matters.