## Connie GROGG v. COLLEY HOME CENTER, INC. and NATIONAL MORTGAGE CORPORATION OF AMERICA

84-49                                          671 S.W.2d 733

Supreme Court of Arkansas
Opinion delivered July 2, 1984

*Peggy O'Neal,* for appellant.

*Daily, West, Core, Coffman & Canfield,* by: *Stanley A. Leasure,* for appellee National Mortgage Corp. of America.

*Hardin, Jesson & Dawson,* by: *Robert T. Dawson* and *Robert M. Honea,* for appellee Colley Home Center, Inc.

STEELE HAYS, Justice. This case comes to us on appeal from a delaratory judgment against the appellant, Connie Grogg, in favor of Colley Home Center, Inc. and National Mortgage Corporation of America. The only question is whether Arkansas or Oklahoma law governs an installment loan contract between the parties for a mobile home purchased in Oklahoma and delivered to Grogg in Arkansas. The contract called for twelve percent interest which would render the indebtedness void under Arkansas law. The Chancellor found the parties intended that Oklahoma law applied and upheld the contract. We affirm.

The first contact between the parties occurred in July of 1978 when Grogg visited the sales lot of Colley Mobile Homes Sales in Barling, Arkansas. None of the mobile homes located on this lot suited her and she was told by a

representative of Colley's that they maintained a separate lot in Roland, Oklahoma and she might find what she wanted there. She drove to the Oklahoma lot that afternoon and chose a 1978 mobile home. She negotiated for the purchase of the home with Don Boshears, the manager of the Oklahoma lot, and signed a contract for its purchase. It was later found that an identical 1979 model, already purchased for the Roland lot and en route to Oklahoma, was temporarily at the Arkansas lot. Boshears called Grogg and offered to sell the later model for the same price, thereby saving her transportation and delivery costs. Grogg agreed and the 1979 model was delivered and set up at a mobile home park in Arkansas.

All negotiations except the telephone call, the signing of all documents, including the assignment of the contract to National Mortgage, occurred in Oklahoma. The down payment was made in Oklahoma and the remaining balance was financed by National of Texas, all payments to be sent to National in Dallas. Colley treated the Roland lot as a separate business operation at all times, maintaining a separate account for that operation. The payment delivered to the manufacturer for the 1979 home was made out of the Roland bank account, and the payment received from National Mortgage when the contract was assigned was deposited to the Roland account. Approximately the same number of homes were offered for sale on each lot. It is not disputed that Colley was never properly qualified through the Secretary of State's office to do business in Oklahoma, however, Colley did have a mobile home dealer's license from the State of Oklahoma for its Roland operation prior to commencing business at that location. We also note the home was delivered to an Arkansas location, Arkansas sales taxes were paid on the transaction, the U.C.C. filing was done in Arkansas, the home was licensed and titled in Arkansas, the license fee charged was based on Arkansas licensing fees, the insurance on the home was written in Arkansas and after the purchase, Grogg bought accessories and repair items from Colley at Barling.

Since *Cooper* v. *Cherokee Village Development Co.,*

236 Ark. 37, 364 S.W.2d 158 (1963), our cases have followed a consistent and reasonable approach to the difficult area of multistate contracts, specifically those involving usury. In *Cooper* we noted that in determining what law governs the validity of a multistate contract we had on different occasions applied three different theories: 1) The law where the contract was made; 2) the law where the contract was to be performed in its most essential features; and 3) the law of the state which the parties intended to govern the contract. We noted, too, in *Cooper* a consistent preference for the law of the state that would make the contract valid rather than void. An exception to the application arises, however, when the issue of usury is involved and the laws of another state become a sham for charging a higher rate and avoiding the harsh penalty applied by our law. We addressed this conflicts problem in *Cooper* where the parties had agreed that New York law would govern the contract. We found all three theories pointed to the law of New York rather than Arkansas and said: "This is not a case of a cloak for usury or where the parties to a wholly Arkansas contract have sought to avoid the Arkansas usury laws by having the validity of the contract determined by the laws of a state having no substantial connection with the contract." In *Snow v. C.I.T. Corp. of the South,* 278 Ark. 554, 647 S.W.2d 465 (1983), our most recent case dealing with the same issue, we reached the same result, applying the law that upheld the contract, but where not all theories pointed to the same state. In *Snow* the transaction had a direct connection with four states: Arkansas, where the contract of sale was negotiated between the president of an Arkansas drilling supply company and an Arkansas resident; Tennessee, where the actual seller, a dealer, had the rig for sale and where the contract documents were signed; Georgia, where the finance company had its principal office and completed the sale by signing the documents, and (whose laws governed the transaction by agreement); and Kansas, where the rig was delivered and used by Snow. With the transaction having a direct connection with four states, we held that the choice of Georgia law was not unreasonable and, like *Cooper,* we found the selection of Georgia law was not a cloak to avoid Arkansas' usury laws.

In *Yarbrough* v. *Prentice Lee Tractor Co.*, 252 Ark. 349, 479 S.W.2d 549 (1972), a case very much like this one, an Arkansas resident purchased a tractor and truck from Prentice, a Louisiana seller, which assigned the note to a Louisiana bank. There was conflict in the testimony but it appeared the negotiations and excution of the contract took place in both states while the equipment was delivered and used in Arkansas. We found no particular act would establish one state's contacts as being more significant than the other. Citing *Cooper,* we held where both states' laws were applicable we would apply the law that would make the contract valid rather than void where it was not a wholly Arkansas contract, nor an attempt to avoid the Arkansas usury penalty through the laws of a state having no substantial connection to the contract. We also found the parties had dealt with each other for a number of years and although there was no evidence the previous contracts were all similar to the one at issue, it was difficult to conceive that the parties entered into these prior contracts with the intention they be construed under the law of Arkansas for if that were the case, cancellation would likely have been previously sought. This, we found, justified an inference that the intention was to subject the agreement to Louisiana law.

In this case, as in *Yarbrough,* we find there are substantial connections to either Arkansas or Oklahoma to allow the laws of either state to govern the transaction and absent a showing of the usurious cloak we will choose the law which will uphold the contract's validity. Such choice is based on a presumption that the parties intend to contract with reference to the law that would uphold, rather than invalidate, their contract. See *Dupree* v. *Virgil R. Cross Mortgage Co.,* 167 Ark. 18 (1924); *Wilson-Ward* v. *Walker,* 125 Ark. 404 (1916). In addition to this presumption we have the fact that Grogg without solicitation or any under-handedness on the part of the appellee sought out the Oklahoma place of business, all the negotiations for the purchase occurred in Oklahoma (extending over a period of four months), all of the many documents were executed in Oklahoma, the primary contracts stated clearly the place of execution as Oklahoma, and on the face of the contracts the

interest rate of twelve percent was obviously stated in clear, unambiguous terms. It was not until almost five years later that Gross, by her own account, was alert enough to notice the interest rate was twelve percent, and raise the usury issue. Yet at the hearing she testified that she had assumed from the beginning that it was "an Arkansas deal, you know; it was delivered in Arkansas, and I lived in Arkansas, I thought the Arkansas law would govern." It is not a strained inference to find that Grogg then, at the time of the making of the contract was aware of Arkansas interest limits and knew or should have known that she was signing a contract for twelve percent interest, yet made no protest until she filed suit almost five years later. The situation is similar to *Yarbrough* where there had been no previous objection under earlier contracts which acted to justify an inference and bolster the presumption that the intention was to subject the agreement to the state that would validate the contract.

The appellant points to two items in the contracts she contends indicate a contrary intest of the parties: Statements that 1) a U.C.C. filing statement must be filed with *this state;* 2) insurance must be acquired by a company authorized to do business in *this state.* We note that the forms were standard forms supplied by National Mortgage of Texas, and obviously were not prepared with the thought in mind of a multistate transaction of this sort which requires a U.C.C. filing where the property will be located, which in this case was Arkansas. Also, Grogg apparently acquired insurance through an out-of-state company that was authorized to do business in Arkansas but that does not compel us to conclude that "this state" in that context dictates Arkansas law as the parties intent. These points are of too little significance to rebut the presumption and the supporting factors discussed above to conclude that the parties intended Arkansas law to govern. Under the facts in this case and the presumption of intent, we cannot say that the finding of the trial court that the parties intended Oklahoma law to govern, was clearly erroneous.

This is not a case of a wholly Arkansas contract where there has been an attempt to avoid the usury law by

substituting the law of a state with no substantial connection with the contract. We have already noted the legitimate connections of Oklahoma to this contract and the parties intent. The appellant has made no showing nor does the evidence suggest a cloak of usury surrounding the transaction and neither was there any evidence of enticement, solicitation, overreaching or any unconscionable act by the appellees. Under these circumstances, we will choose the law of the state that will make the contract valid rather than void.

Affirmed.

PURTLE, J., dissents.

JOHN I. PURTLE, Justice, dissenting. I disagree with the interpretation of the facts by the majority. As I understand the facts the contract here in question is clearly an Arkansas contract and therefore should be declared usurious. A more perfect case of evading the harsh penalties of the prior Arkansas usury law cannot be found.

· The appellant is a resident of Arkansas and the appellee, Colley Home Center, Inc., is a corporation doing business in Barling, Arkansas and at another site in Roland, Oklahoma. Appellant visited Colley's Barling location and when she found no mobile home to her liking she was sent by Colley to their branch lot in Roland where she found one she decided to purchase. The purchase papers were completed at that time in Oklahoma. Before the delivery took place an employee of Colley called and informed appellant that they had a 1979 model mobile home on the Barling lot which they could sell her at the same price as they had sold her the 1978 model. Colley explained to her that they would save her money on set-up and delivery charges if she decided to purchase the newer model. Appellant elected to purchase the 1979 model which was located on the Arkansas lot. In fact it was manufactured in Arkansas. She was instructed by Colley to go to the Oklahoma lot and execute the new purchase agreement. The home was then delivered by the Barling operation and set-up in Van Buren, Arkansas on a lot owned by Colley and rented to appellant. The Arkansas sales tax was paid on the sale of the mobile home and the

financing statement was filed in Arkansas. It was titled and licensed in Arkansas.

The only thing occurring in Oklahoma in relation to this contract was that appellant crossed the state line from Arkansas for the sole purpose of executing the contract. It is hard for me to believe that the purpose of that trip, at the request of Colley, was not solely for the purpose of evading the ten percent usury law in Arkansas. None of the negotiations on the purchase of this home were conducted in Oklahoma. Obviously there was a novation of the Oklahoma contract on the 1978 model. "Center of gravity," "most contacts," "substantial connection" and all other theories or rules cause this to be an Arkansas contract. This contract was made in Arkansas and to be performed in Arkansas. I would void the contract and cancel the debt.