# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1809

_____

| | |
|---|---|
| Heating & Air Specialists, Inc., <br> d/b/a A/C Service Company, | * <br> * <br> * |
| | * |
| Appellant, | * |
| | * |
| v. | * |
| | * |
| James Jones, | * |
| | * |
| Appellant, | * |
| | * |
| v. | * |
| | * Appeals from the United States |
| Lennox Industries, Inc., | * District Court for the |
| | * Western District of Arkansas |
| | * |
| Appellee. | * |

_____

No. 98-2047

_____

| | |
|---|---|
| Heating & Air Specialists, Inc., <br> d/b/a A/C Service Company, | * <br> * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Lennox Industries, Inc., | * |

Appellant.

_____

Submitted: January 14, 1999

Filed: June 7, 1999
_____

Before WOLLMAN[1], FLOYD R. GIBSON, Circuit Judges, and TUNHEIM,[2] District Judge

_____

TUNHEIM, District Judge.

Heating and Air Specialists, Inc. ("A/C") brought suit against Lennox Industries, Inc. ("Lennox") alleging breach of contract, violation of the Arkansas Franchise Practices Act, Ark. Code Ann. §§ 4-72-201 *et seq.* ("AFPA"), and fraud arising from Lennox's decision to terminate A/C's franchise with Lennox. Lennox counterclaimed for amounts allegedly due from the sale of goods to A/C, and joined James Jones ("Jones"), A/C's sole shareholder, as a third party counter-defendant. The district court dismissed A/C's claim under the AFPA on a motion for summary judgment, but permitted the remaining issues to proceed to trial. A/C and Jones appeal from the district court's grant of summary judgment on A/C's claim under the AFPA. They further argue that the district court erred by submitting various instructions to the jury, including an instruction stating that A/C could be liable on Lennox's counterclaim without regard to whether Lennox breached its agreements with A/C, and an instruction

_____

[1]The Honorable Roger L. Wollman succeeded the Honorable Pasco M. Bowman as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the end of the day on April 23, 1999.

[2]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota, sitting by designation.

regarding Jones's individual liability for A/C's debts that did not require Lennox to prove fraud in order to disregard the corporate entity. A/C and Jones additionally claim that the district court erred in failing to instruct the jury on the issues of promissory estoppel and waiver. Lennox cross-appeals, arguing that the district court erred in submitting A/C's breach of contract claims to the jury. We reverse in part and affirm in part.

## I.

A/C, a corporation engaged in marketing heating and air conditioning products, began negotiating with Lennox to become a dealer of Lennox equipment and supplies in 1994. Lennox representatives met with Jones at A/C's office in Van Buren, Arkansas, and made several specific promises to A/C in connection with the proposed dealership. Lennox documented these agreements in a written memorandum to Jones dated September 27, 1994. The agreements include a promise to provide $40,000 for start-up costs, a minimum of 3.5 percent account credit on purchases from Lennox for A/C's advertising costs ("co-op payments"), and an option to sell Lennox products on consignment. Furthermore, Jones testified at trial that sometime in 1994 Lennox representatives verbally offered A/C the option to participate in a "fall stocking program" providing deferred payment due dates in May, June and July for products purchased in the fall.

The parties signed a "dealer agreement" on October 10, 1994, consisting of a standard form contract drafted by Lennox that set forth the terms of its business relationship with its dealers. It stated that it was effective through December 31, 1994, but that either party could terminate the agreement with or without cause upon thirty days' notice. It further stated that the agreement would terminate immediately upon the occurrence of any of several enumerated events, including A/C opening another facility at a location not specified therein. It also contained a choice of law clause, stating that "the laws of the State of Texas shall govern [the agreement's] interpretation." The

parties thereafter signed virtually identical contracts effective from January 1, 1995 through December 31, 1995, and January 2, 1996 through December 31, 1997.

At the inception of the parties' business relationship, A/C operated only one location out of its principal office in Van Buren, Arkansas. Sometime in early 1995 Jones decided to open a location in Tulsa, Oklahoma. Although the parties offered conflicting testimony as to whether Lennox initially knew about A/C's entry into the Tulsa market, they agree that ultimately Lennox's district sales manager for both Oklahoma and Arkansas, Francis Franck ("Franck"), became aware of it. Franck met with Jones sometime in 1995 and gave Jones verbal authorization to sell Lennox products in Tulsa, at least on a temporary basis,[3] however, at no time did any of the three dealer agreements between A/C and Lennox ever reflect that A/C had permission to operate a location in Tulsa. Several of Lennox's pre-existing dealers in Tulsa subsequently complained to Lennox about A/C's presence in the Tulsa market.

In September 1995 Lennox terminated Franck's employment and appointed two new district sales managers for Arkansas and Oklahoma. A/C states that its relationship with Lennox deteriorated rapidly following Franck's termination. Jones testified at trial that Lennox promised A/C deferred payment terms under its fall stocking program for 1995, but dishonored those terms by including immediate due dates on invoices to A/C for products purchased under the program.

In the spring of 1996, Lennox's district sales manager over Tulsa decided to terminate A/C's franchise at that location. He testified at trial that among the factors contributing to his decision was A/C's failure to keep its account with Lennox current. On July 3, 1996, Lennox representatives met with Jones at his office in Van Buren and

---

[3]Franck testified at trial he only authorized A/C to "test" market in Tulsa, and that Lennox could terminate the test at any time. Jones offered contradictory testimony stating that Franck authorized A/C to sell Lennox products in Tulsa for several years.

informed him of Lennox's decision to terminate the Tulsa franchise. Lennox documented its decision in a letter to Jones dated July 11, 1996. The letter noted that A/C's location in Tulsa was not a franchise location authorized under the January 2, 1996 dealer agreement between the parties, but did not inform A/C that its delinquent account was a reason for Lennox's decision to terminate the franchise. The letter stated that August 1, 1996 was a "target" date for terminating A/C's purchases from Lennox for the Tulsa location, but stated that Lennox was willing to give A/C more time upon request through September 30, 1996.

On August 9, 1996, Lennox sent A/C a letter terminating its entire franchise. The letter stated that A/C had defaulted on its payment obligations and that for this reason Lennox would terminate the parties' relationship ninety days from the date of the letter if A/C failed to rectify the deficiency within the next ten days. A/C did not pay the outstanding balance on its account within the time specified, and Lennox accordingly terminated the franchise. A/C filed suit against Lennox later the same month.

At trial the district court bifurcated A/C's surviving claims into a breach of contract claim for each franchise location, and a fraud claim for each location. The jury found in favor of Lennox on both fraud claims and in favor of A/C on both breach of contract claims. It awarded A/C zero damages on the "Van Buren breach of contract," and $40,000 on the "Tulsa breach of contract." The jury additionally awarded Lennox $233,236 on its counterclaim for A/C's outstanding account balance, resulting in a net judgment in favor of Lennox of $193,236.

## II. Choice of Law

In dismissing A/C's claim under the AFPA on summary judgment, the district court held that under the choice of law rules of Arkansas the substantive laws of Texas governed the parties' relationship. Our review of the district court's determination of

state law and its application of the state's choice of law rules is *de novo*.  *See Whirlpool Corp. v. Ritter*, 929 F.2d 1318, 1321 n.4 (8th Cir. 1991).  "Federal district courts apply the choice of law rules of the state in which they sit when jurisdiction is based on diversity of citizenship."  *Baxter Int'l, Inc. v. Morris*, 976 F.2d 1189, 1195 (8th Cir. 1992) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)).  The district court thus correctly found that the choice of law rules of Arkansas govern the determination of this matter.  We disagree, however, with the manner in which the district court applied those rules.

In contract actions raising conflict of laws issues, the Arkansas courts have developed two apparently separate and opposing lines of cases.  In *Cooper v. Cherokee Village Development Co.*, the Arkansas Supreme Court noted that courts have applied four tests to determine what law governs a multi-state contract:

> The law of the state in which the contract was made; the law of the state in which the contract is to be performed in its most essential features; the law of the state which the parties intended to govern the contract, provided that state has a substantial connection with the contract; and, the law of the state which has the most significant contacts with the matter in dispute (also known as the 'center of gravity' or 'grouping of contacts' theory).

364 S.W.2d 158, 161-62 (Ark. 1963) (citing Leflar, Conflict of Laws §§ 124, 125 (1959)).  Applying only the first three theories to the case at bar, the *Cooper* court explicitly refused to adopt the "center of gravity" approach.  *Id.* at 162.  The court thus considered only the state of contract execution, the state of performance, and the parties' explicit choice of law in determining that the laws of New York rather than Arkansas governed the contract at issue.  The court accordingly upheld the validity of the contract, which was usurious under the laws of Arkansas but enforceable under the laws of New York.  In further support of its decision the *Cooper* court argued, "This court has consistently inclined toward applying the law of the state that will make the

contract valid, rather than void." *Id.  But see Huchingson v. Republic Finance Co.*, 370 S.W.2d 185, 186 (Ark. 1963) (citing *Cooper* and cautioning that the courts' inclination toward the law that will make the contract valid "is only applicable where ostensibly the law of either state could apply, or where there is doubt as to which properly should apply"); *cf. Evans v. Harry Robinson Pontiac-Buick, Inc.*, 1999 WL 33911, *4 (stating that *Huchingson* is still good law).

With no discussion of *Cooper* or the test established therein, the Arkansas Supreme Court reversed its position in *Standard Leasing Corp. v. Schmidt Aviation, Inc.*, applying the center of gravity approach to determine the choice of law governing a multi-state contract. 576 S.W.2d 181,184 (Ark. 1979). Because the court found that the "principal significant contacts" in the parties' transactions occurred in Arkansas, it held that the agreement was "an Arkansas contract, governed by Arkansas law," even though it contained a choice of law clause dictating a different result. *Id*. The court then affirmed the district court's determination that the contract at issue was void under the Arkansas usury statutes. *See id.*

Arkansas Supreme Court cases following *Standard Leasing* have vacillated between the *Cooper* and *Standard Leasing* approaches, generally citing to one case without referencing the other. *See Ducharme v. Ducharme*, 872 S.W.2d 392, 394 (Ark. 1994) (citing *Standard Leasing* and applying the principal contacts test when the contract contained no choice of law provision); *Arkansas Appliance Distrib. Co. v. Tandy Elecs. Inc.*, 730 S.W.2d 899, 900 (Ark. 1987) (citing *Cooper* to uphold the parties' choice of law clause upon finding that the state chosen had a "substantial connection" with the contract); *Stacy v. St. Charles Custom Kitchens, Inc.*, 683 S.W.2d 225, 226-27 (Ark. 1985) (finding that both states had substantial connections to the contract, and citing *Cooper* for the proposition that the court should apply the law of the state that would make the contract valid); *Grogg v. Colley Home Center, Inc.*, 671 S.W.2d 733, 734 (Ark. 1984) (citing *Cooper* and applying the law that would uphold the contract when both states had substantial connections to it); *Snow v. C.I.T. Corp.*

*of the South, Inc.*, 647 S.W.2d 465, 467 (Ark. 1983) (applying *Cooper* to uphold the parties' choice of law clause); *Tri-State Equip. Co., Inc. v. M.C. Tedder*, 614 S.W.2d 938, 939-40 (Ark. 1981) (citing *Standard Leasing* and using the principal contacts test in applying the law of the state that would invalidate both the contract and the parties' choice of law provision). *But see McMillen v. Winona Nat'l & Sav. Bank*, 648 S.W.2d 460, 462 (Ark. 1983) (citing both *Standard Leasing* and *Cooper* in a case in which both the principal contacts test and the parties' choice of law clause dictated applying the laws of the same state).

This Court has applied both the *Cooper* and *Standard Leasing* approaches in diversity jurisdiction cases requiring the Court to implement Arkansas choice of law rules. *See Whirlpool*, 929 F.2d at 1321 (citing both cases, but applying a principal contacts test to a contract with no choice of law provision); *In re NWFX, Inc. v. Crown Convenience*, 881 F.2d 530, 536 (8th Cir. 1989) (citing both the principal contacts and *Cooper* tests, and applying both tests to a contract containing no choice of law clause); *Union Nat'l Bank v. Federal Nat'l Mortgage Ass'n*, 860 F.2d 847, 853 n.13 (8th Cir. 1988) (citing *Standard Leasing* and applying the significant contacts test to a contract containing no choice of law provision); *Aetna v. Great Nat'l Corp.*, 818 F.2d 19, 20 (8th Cir. 1987) (applying the *Cooper* test and choosing the state designated by the contract's choice of law provision).

These cases have adhered to a growing trend in the most recent Arkansas decisions of applying the *Standard Leasing* significant contacts test only when the contract at issue contains no explicit choice of law provision.[4] *See Union Nat'l Bank*, 860 F.2d at 853 n.13 (arguing that "[s]ince the agreement of the parties did not specify

---

[4]Although earlier cases such as *Standard Leasing*, 576 S.W.2d at 183, and *Tri-State Equipment*, 614 S.W.2d at 939-40, used the principal contacts test to reject an explicit choice of law provision, no Arkansas Supreme Court case has done so since 1981.

the law to be applied, a 'significant contacts' or 'center of gravity' test is appropriate"). Although a strict rule applying *Standard Leasing* to all contracts without choice of law provisions and *Cooper* to all contracts with choice of law provisions may not be appropriate in every case,[5] this principle reflects generally the most recent decisions in this Court and in the Arkansas Supreme Court.

Whether the parties to this case chose the law of Texas to govern their rights and obligations under the contract is thus critical to our choice of law analysis. We disagree with the district court's determination on this issue and hold that they did not. Although each of the three dealer agreements that the parties executed contains a choice of law provision, the language of that provision is substantially more narrow than that typical of most choice of law clauses. It states in relevant part, "This Agreement is executed in duplicate on the above date and the laws of the State of Texas shall govern its *interpretation*." (Emphasis added.) This language is in sharp contrast with the more broad choice of law clauses scattered throughout the cases, providing that the law of a particular state would "govern the contract," *see, e.g., Evans*, 1999 WL at *1, "govern the rights and obligations of the parties," *see, e.g., Bice Construction Co. v. C.I.T. Corp.*, 27 B.R. 543, 545 (E.D. Ark. 1982), or "govern the interpretation and enforcement of the contract," *see, e.g., DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 675 (Tex. 1990). The language that Lennox used in its dealer agreements, when read according to its plain meaning, does not effectively displace the

---

[5]Several Arkansas cases suggest that the center of gravity approach is unhelpful and thus inappropriate, even when no choice of law clause exists, when neither state has substantially greater contacts than the other with the parties' transactions. *See Yarbrough v. Prentice Lee Tractor Co.*, 479 S.W.2d 549, 552 (Ark. 1972) ("There is no particular act that would establish one state's contacts as being more significant than the other; there are however general principles which come into play.); *Grogg*, 671 S.W.2d at 734-35 (citing *Yarbrough*); *Stacy*, 683 S.W.2d at 226-27 (citing *Grogg*). In these cases, the courts have fallen back on the principle established in *Cooper*, that the law of the state that would uphold the validity of the contract applies. *See Yarbrough*, 479 S.W.2d at 552; *Grogg*, 671 S.W.2d at 735; *Stacy*, 683 S.W.2d at 227.

entire body of Arkansas protective legislation but merely provides that Texas rules of contract construction should apply. The choice of law language thus did not provide A/C with fair warning that in signing the dealer agreements it would forfeit its right to protection under the AFPA. Lennox's use of such narrow language when drafting its dealer agreements evinces an intent to limit the effect of the choice of law provision, and Lennox has proffered no extrinsic evidence demonstrating that the parties had a contrary intent. Furthermore, although we find that the plain language of the parties choice of law provision is unambiguous, we note that to the extent that there is room for disagreement, we must construe any ambiguity in the contract against Lennox. *See, e.g., Sturgis v. Skokos*, 977 S.W.2d 217, 222 (Ark. 1998) (stating the long-standing rule of contract construction that ambiguities in a contract are construed against the drafter). The parties' limited choice of Texas law thus has no impact on the determination of whether A/C can claim protection under the AFPA.

Because no choice of law provision governs the precise issue before the Court, the principal contacts analysis set forth in *Standard Leasing* is applicable. We must therefore consider whether Arkansas or Texas had the most significant contacts with the contracts at issue. Lennox notes that the agreements by their express terms did not become effective until it signed them in Texas, that A/C communicated by mail or telephone with Lennox's office in Texas periodically throughout their relationship, and that A/C performed its part of the agreement by mailing payments to Lennox's Texas address. Although these contacts to some degree connected the parties' relationship to Texas, we hold that the connection to Arkansas was qualitatively more significant. A/C executed the agreements in Arkansas, Lennox shipped its goods to A/C in Arkansas, and the dealer agreements themselves indicated that the franchise would operate in Arkansas. According to Lennox, A/C's right to advertise and sell Lennox products under the agreements was geographically restricted to Van Buren, Arkansas. Furthermore, Lennox actively sought A/C's participation in the franchise by sending its representatives to A/C's office in Arkansas, and the bulk of the parties' negotiations took place in Arkansas between Jones and various Lennox representatives for the

Arkansas territory. Indeed, the record is void of evidence demonstrating that A/C representatives traveled to Texas at any time. The state where the parties initiate and conduct negotiations weighs heavily in Arkansas courts' principal contacts analysis. *See McMillen*, 648 S.W.2d at 462 (finding the state where the parties initiated contact to be a significant factor). For these reasons we hold that the substantive laws of Arkansas generally govern the parties' rights and responsibilities under the agreements, while the substantive laws of Texas provide the applicable rules of contract construction. Accordingly, the district court erred in holding that the AFPA does not apply.

The AFPA explicitly prohibits a franchisor from canceling a franchise without good cause. The provision contained in the parties' dealer agreements that permitted either of them to terminate their relationship "without cause" is therefore invalid under the AFPA. Nevertheless, under the particular facts of this case the district court's error was harmless. We find that Lennox had good cause to cancel the franchise, and therefore, the AFPA affords A/C no protection. The AFPA enumerates several specific examples of "good cause," including, "Failure of the franchisee to pay to the franchisor within ten (10) days after receipt of notice of any sums past due the franchisor and relating to the franchise." Ark. Code Ann. § 4-72-202(7)(H). In canceling A/C's franchise, Lennox provided A/C with a notice stating that $198,627 was past due on A/C's account, and that A/C had "ten days in which to rectify the deficiency" in order to prevent termination. Although the parties disputed the precise amount of the deficiency, the uncontroverted evidence adduced at trial shows that on the date of the termination notice A/C's account was past due. A/C further admits that it did not repay any part of the amount owed within the ten-day grace period provided. Lennox therefore had good cause to terminate the franchise, and A/C's claims under the AFPA fail as a matter of law.

A/C attempts to divert attention from its failure to pay Lennox in a timely fashion by arguing that Lennox's breach of their agreements artificially threw A/C into default.

A/C specifically contends that because Lennox reneged on its promise to provide A/C with start-up costs, co-op payments and fall stocking terms, it was unable to keep its account current. These arguments are unpersuasive. The evidence shows that the amount past due on A/C's account far exceeds the amount of any start-up or co-op payments it was entitled to receive,[6] and therefore, any failure on the part of Lennox to honor these promises cannot account for the deficiency. Furthermore, even if Lennox had provided A/C with fall stocking terms, those terms would have required repayment in May, June and July 1996. Lennox did not terminate A/C's franchise until August 9, 1996, after A/C's payments would have been due in any event. Lennox's failure to provide promised deferred payment terms thus could not have caused the default that existed on the date of termination. For these reasons, Lennox's breach of its agreements with A/C has no effect on the Court's determination that Lennox had good cause to terminate the franchise.

### III. Lennox's Counterclaim

A/C and Jones appeal the district court's charge to the jury regarding Lennox's counterclaim, which stated, "In connection with Lennox's claim against A/C, there is a dispute as to the amount of the purchase price owed to Lennox and unpaid by A/C. The burden is on Lennox to prove the amount of the purchase price unpaid." A/C argues that the district court additionally should have instructed the jury that, "A party is relieved of the duty to perform a contract if the other party to the contract prevented him from performing." The crux of A/C's complaint is that in failing to so instruct the jury, the district court deprived A/C of its ability to argue that Lennox's failure to

---

[6]Various A/C representatives testified at trial that Lennox owed A/C $12,000 in promised co-op payments, and $40,000 in promised start-up funds. In contrast, A/C's account with Lennox showed an outstanding balance of approximately $198,000 on the date Lennox terminated A/C's franchise.

provide A/C with promised start-up funds, co-op payments and deferred payment terms caused A/C to breach its obligation to pay Lennox for the goods it received.

As argued above, Lennox's failure to perform its obligations under the agreement logically could not have prevented A/C from paying the entire amount past due on its account. The theory upon which A/C predicated its jury instruction request is thus inherently flawed. Furthermore, A/C's requested instruction misstates the law applicable to the parties' transaction. A/C argues that the Restatement (Second) of Contracts supports its request. The relevant provision states:

> [I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.

Restatement (Second) of Contracts § 237 (1979). Based on this provision, A/C contends that Lennox's failure to fulfill its obligations relieved A/C of its duty to pay for the Lennox products that it received and accepted.

A/C's assumption that the common law of contracts applies to Lennox's counterclaim is in error. Although the parties' franchise agreement is a mixed contract for the sale of goods and services, the transaction at issue is fundamentally an exchange of goods. The Uniform Commercial Code (U.C.C.), which both Arkansas and Texas have adopted in relevant part, governs such transactions. *See* U.C.C. § 2-102; Ark. Code Ann. § 4-2-102; Tex. Bus. & Com. Code Ann. § 2.102. Under the U.C.C., A/C became obligated to pay for the goods when it accepted them. *See* U.C.C. §§ 2-607(a); Ark. Code Ann. § 4-2-607(a); Tex. Bus. & Com. Code Ann. § 2.607(a) ("The buyer must pay at the contract rate for any goods accepted."). The U.C.C. contains no provision relieving a buyer of this obligation because of a breach that is unrelated to the goods or to their shipment. Plaintiff's theory is thus wholly unsupported by the law

governing the parties' exchange of goods. The district court's decision to deny the requested jury instruction is accordingly affirmed.[7]

## IV. Tulsa Breach of Contract

Lennox cross-appeals from the district court's denial of its motion for judgment as a matter of law with regard to A/C's breach of contract claim concerning the Tulsa operation. Lennox argues that A/C's claim fails as a matter of law because its overdue account gave Lennox a statutory right to cancel their agreement.

When we review the denial of a motion for judgment as a matter of law, we must: (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) affirm the denial of the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn. *See Hastings v. Boston Mutual Life Ins. Co.*, 975 F.2d 506, 509 (8th Cir. 1992). Nevertheless, we must not give the nonmoving party "the benefit of unreasonable inferences, or those at war with the undisputed facts." *Larson v. Miller*, 76 F.3d 1446, 1452 (8th Cir. 1996) (citing *City of Omaha Employees Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 651 (8th Cir. 1989)). "A mere scintilla of evidence is inadequate to support a verdict, and judgment as a matter of law

---

[7]Even if the Court were to apply the Restatement to the transaction at issue, it does not support plaintiff's position. The Restatement provides that an uncured material breach relieves the non-breaching party of the obligation to complete performance, however, it does not relieve that party of the obligation to pay for any benefit that the breaching party has already conferred. *See* Restatement (Second) of Contracts § 374 (1979) ("[I]f a party justifiably refuses to perform on the ground that his remaining duties of performance have been discharged by the other party's breach, the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach.").

–14–

is proper when the record contains no proof beyond speculation to support the verdict." *Id.* (citation omitted).

We conclude from the overwhelming evidence offered at trial that A/C's account with Lennox had fallen seriously behind on July 3, 1996, the date upon which Lennox first notified Jones that it would no longer sell products to him for marketing in the Tulsa territory. Lennox submitted letters, invoices, and business records demonstrating that A/C's account was more than $200,000 in arrears from February 1996 through June 1996. On June 20, 1996, Lennox's records showed an amount past due of $211,389. Although the parties disputed the amount that A/C owed Lennox at trial, A/C's own exhibit shows an amount past due in July 1996 of over $114,000. A/C does not contest this evidence, and thus, no reasonable jury could find that A/C's account was current on the date that Lennox withdrew permission for the sale of its products in Tulsa.

Under the U.C.C. as enacted under the laws of both Arkansas and Texas, "Where the buyer wrongfully . . . fails to make payment due on or before delivery . . . and, if the breach is of the whole contract . . . then also with respect to the whole undelivered balance, the aggrieved seller may . . . cancel." Ark. Code Ann. § 4-2-703(f); Texas Bus. & Com. Code Ann. § 2.703. In *Frigiking, Inc. v. Century Tire & Sales Co.*, 452 F. Supp. 935, 938 (N.D. Tex. 1978), the court found under the Texas version of this provision that a corporation was justified in canceling the distributorship agreements with its dealer because of its "chronic large overdue balances." The court concluded that the dealer had breached the agreements so as to impair the whole contract. *See id.* In *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1366-67 (8th Cir. 1983), we cited *Frigiking* with approval and held that a tire company justifiably canceled its dealership agreement because of the dealer's chronic failure to make timely payments. We accordingly affirmed the district court's summary judgment dismissal of the dealer's claim for wrongful termination of the agreement. Both *Frigiking* and *Camfield Tires* are analogous to the case at bar, and therefore, Lennox

–15–

had a statutory right to cancel any contract with A/C to deliver goods for resale in Tulsa.

A/C and Jones attempt to distinguish *Frigiking* and *Camfield Tires* on the ground that Lennox failed to notify A/C that its past due account was a reason for its decision to terminate the Tulsa operation. Instead, Lennox stated verbally that A/C was not a part of the "core dealership" in Tulsa, and further stated in writing that Tulsa did not appear as an authorized location on the parties' dealership agreement. A/C's argument appears to rest on the assumption that Lennox had an obligation to provide notice to A/C along with an explanation of all of its reasons for cancellation.

A/C cites no authority for this proposition, and it is not supported by the U.C.C. The U.C.C. draws a distinction between "termination" of a contract for the sale of goods and "cancellation" of the contract. *See* U.C.C. § 2.106. Although the U.C.C. requires a party to give reasonable notice upon termination of a contract, *see* U.C.C. § 2.309, no such notice is required in order to cancel it for failure to pay, *see* U.C.C. § 2.703. In *International Therapeutics, Inc. v. McGraw-Edison Co.*, 721 F.2d 488, 492 (5ᵗʰ Cir. 1983), the court explained this distinction: "The reason is obvious; an aggrieved seller dealing with a buyer who is in breach of their contract should not normally be obliged to put the delinquent buyer on notice before terminating future relations." Lennox therefore had no obligation to provide A/C with notification of its reasons for canceling the agreement permitting A/C to purchase products for resale in Tulsa. Thus, even assuming that Lennox agreed that the Tulsa operation could continue for a period of years, Lennox's cancellation of that agreement was proper and A/C's breach of contract claim with regard to Tulsa fails as a matter of law.

## V. Promissory Estoppel

A/C and Jones next argue that the district court erred in refusing to instruct the jury on the issue of promissory estoppel. They claim that Lennox breached a promise

to A/C that permitted it to market products in the Tulsa area by unjustifiably withdrawing its permission after A/C reasonably acted in reliance thereon by investing advertising and other resources into the new location.

The promissory estoppel doctrine states that, "[a] promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *F.B. Reynolds v. Texarakana Const. Co.*, 374 S.W.2d 818, 819-20 (Ark. 1964) (citing the Restatement of Contracts, § 90). Arkansas courts have permitted parties to assert the doctrine of promissory estoppel as an alternative to breach of contract in the absence of consideration or as a means of overcoming a statute of frauds defense. *See Dickson v. Delhi Seed Co.*, 760 S.W.2d 382, 388 (Ark. Ct. App. 1988); *Sanders v. Arkansas-Missouri Power Co.*, 593 S.W.2d 56, 58 (Ark. Ct. App. 1980). The courts of Arkansas thus have applied the doctrine in order to overcome deficiencies in the formation of an enforceable contract, but have not applied it in order to determine the parties' rights under a contract that is otherwise enforceable. Their failure to do so reflects the widely accepted principle that promissory estoppel is applicable only in the absence of an otherwise enforceable contract. *See, e.g.*, *Rho v. Vanguard OB/GYN Assoc., P.C.*, 199 WL 228993, *6 (E.D. Pa. 1999); *Doyle v. Holy Cross Hosp.*, 708 N.E.2d 1140, 1147 (Ill. 1999); *Feinberg v. Saunders, Karp & Megrue, L.P.*, 1998 WL 863284, *17 (D. Del. 1998); *Premier Tech. Sales, Inc. v. Digital Equip. Corp.*, 11 F. Supp.2d 1156, 1164 (N.D. Cal. 1998); *Vogel v. Travelers Indem. Co.*, 966 S.W.2d 748, 754 (Tex. Ct. App. 1998); *Frey v. Ramsey County Community Human Svc.*, 517 N.W.2d 591, 602 (Minn. Ct. App. 1994); *Scott Co. v. MK-Ferguson Co.*, 832 P.2d 1000, 1003 (Col. Ct. App. 1992).

In the instant action we find that any error in the district court's failure to instruct the jury on the promissory estoppel issue was harmless. The district court permitted A/C to submit a claim for breach of contract against Lennox based on the withdrawal

of its permission to continue marketing products in the Tulsa territory. The jury found for A/C on the breach of contract claim and awarded damages in the amount of $40,000. In arriving at this verdict the jury necessarily found that an enforceable contract between the parties existed. This finding moots the issue of whether, in the absence of an enforceable contract, Lennox may have been liable to A/C under a theory of promissory estoppel. Our decision to reverse the award based on A/C's failure to make timely payments has no impact on this conclusion, because in doing so we do not overturn the jury's implicit finding that an enforceable contract existed. The district court's refusal to permit A/C's claim under this theory to proceed thus does not constitute reversible error.

## VI.  Jones's Individual Liability for A/C's Debts

A/C and Jones argue that the district court erroneously instructed the jury that Jones could be subject to individual liability for A/C's debts without a showing of fraud. The district court's instruction, which substantially adopted the language found in Devitt, Blackmar & Wolf, *Federal Jury Practice and Instructions Civil*, Vol. 3, § 76.05, stated that "the existence of a corporate entity may be disregarded where it is proven that the corporation is a mere instrumentality or agent of an individual owning all or most of its stock, or where the corporation's purpose is to evade some statute or to accomplish some fraud or illegal purpose." In so charging the jury the district court rejected the instruction proposed by A/C and Jones, which required Lennox to prove:

(1)     That Jim Jones operated A/C Service Company in such a manner as to demonstrate that he did not recognize the separate character of the business, and

(2)     He did so in order to defraud its creditors of money or property.

(Appellee's Addendum, at 4.)

–18–

A/C and Jones do not cite a single state or federal case interpreting Arkansas law for the proposition that a showing of fraud is required in order to disregard the corporate entity. Indeed, the Arkansas Supreme Court has held explicitly that proof of fraud is not a prerequisite to finding a parent corporation liable for the debts of its subsidiaries. *See Arkansas Bank & Trust Co. v. Douglass*, 885 S.W.2d 863, 870 (Ark. 1994) ("No fraud was alleged . . . but none is required."). Arkansas courts have further held that the principles set forth in *Arkansas Bank & Trust* are applicable to cases such as this one, in which a creditor seeks to hold a corporation's principal shareholder individually liable for its debts. *See Winchel v. Craig*, 934 S.W.2d 946, 950 (Ark. Ct. App. 1996). The jury instruction proposed by Jones and A/C therefore plainly misstates the law, and the district court's failure to require a showing of fraud was not in error.

A/C and Jones further argue that Lennox offered insufficient evidence at trial to support the jury's finding that A/C was Jones's alter ego. What constitutes "sufficient evidence" under Arkansas law is not clearly defined. The courts have hesitated to establish a rigid test and have held instead that "[t]he conditions under which the corporate entity may be disregarded or looked upon as the alter ego of the principal stockholder vary according to the circumstances of each case." *Humphries v. Bray*, 611 S.W.2d 791, 793 (Ark. Ct. App. 1981). Moreover, *Woodyard v. Arkansas Diversified Ins. Co.*, 594 S.W.2d 13, 17 (Ark. 1980), held simply that "courts will ignore the corporate form of a subsidiary where fairness demands it." *See also Humphries*, 611 S.W.2d at 791 (holding that the doctrine of piercing the corporate veil should be applied "to prevent an injustice").

Nonetheless, a few courts have suggested that disregarding the corporate entity is appropriate only upon a showing of some form of wrongdoing. *See Woodyard*, 594 S.W.2d at 17 ("[u]sually this will be where it is necessary to prevent wrongdoing and where the subsidiary is a mere tool of the parent"). Other cases have held that a court may disregard the corporate entity only when "the corporate form has been illegally

abused to the injury of a third person." *Rounds & Porter Lumber Co. v. Burns*, 225 S.W.2d 1, 2-3 (Ark. 1949); *see also Black & White, Inc. v. Love*, 367 S.W.2d 427, 432 (Ark. 1963); *Banks v. Jones*, 390 S.W.2d 108, 110 (Ark. 1965); *Fausett Co. v. Rand*, 619 S.W. 2d 683, 686 (Ark. Ct. App. 1981).

These prescripts beg the question of when sufficient "wrongdoing" exists or when the corporate form has been "illegally abused." In *Arkansas Bank & Trust Co.*, the court found sufficient wrongdoing present, in the absence of fraud or illegal intent, when the corporate form permitted the corporation and its subsidiaries "to do indirectly that which it could not do directly." 885 S.W.2d at 870. Other cases emphasize the significance of a party's failure to respect the separateness of the corporate entity in finding that the corporate form has been illegally abused. *See, e.g., Humphries*, 611 S.W.2d at 792-93 (finding that businesses did not comply with the principles of corporate law "as to form and to practice," when they had the same principal stockholder or proprietor, operated at the same location, shared a bookkeeper, held the same name on important tax filings, and paid employees from the same accounts); *Black & White*, 367 S.W.2d at 431-32 (noting that the same shareholders owned two corporations at issue, that they shared assets, and that their business operations were significantly intertwined); *cf. Banks*, 390 S.W.2d at 110 (finding corporate form between subsidiaries had not been illegally abused when "there was no interchange of employees, facilities, funds and management").

Upon reviewing the trial record, we find that substantial evidence exists to support the jury's finding of individual liability against Jones. Lennox offered the expert testimony of a certified public accountant stating that A/C paid Jones thousands of dollars in dividends during years in which the company's records showed a deficit in its earnings, and furthermore, that the salary A/C paid Jones was far above the average for managers of similar operations. Moreover, Jones testified at trial that A/C paid credit card expenses on his behalf for personal merchandise, services and various personal trips to casinos. Furthermore, the company supplied Jones with checks for

"expenses" before he left on business trips which were never documented. A/C additionally paid for a boat, a Mercedes Benz, and a BMW for Jones and his wife to use. This evidence strongly supports an inference that Jones may have been siphoning funds from the faltering company for his own personal expenses to the detriment of its creditors.[8] To permit a shareholder to use the corporate form as a shield in such circumstances would unjustly elevate the corporate fiction over the substantive relationships between the parties. The Court accordingly finds that the jury's finding of liability against Jones was supported by substantial evidence.

## VII. Waiver

A/C and Jones additionally assert that the district court's rejection of its jury instruction on the doctrine of waiver constitutes reversible error. Their waiver theory arises from series of invoices Lennox sent to A/C. Each invoice contains a summary of the activity on A/C's account with Lennox under a series of columns captioned "Account Balance on Last [Statement] Date," "Cash Received," "Cash Discount Allowed," "Total Net Credits & Billings," "Other Adjustments," and "Account Balance." Beginning in January 1997, several months after A/C initiated the instant litigation, Lennox's invoices to A/C began showing a credit in the "Other Adjustments" column in the amount of $233,236.55. Both parties agree that this figure represents the amount of Lennox's counterclaim against A/C for unpaid goods received. Despite the credit shown, however, each invoice also continued to show in the "Account Balance" column that the amount of Lennox's counterclaim was still owing, in addition to any

---

[8]A/C and Jones attempt to explain this evidence by arguing, for example, that Jones and his wife used the cars for business purposes, and that amounts paid to A/C by Jones in order to keep the company afloat exceed the amounts that A/C paid Jones for expenses and dividends. These arguments inappropriately ask the Court to reweigh the evidence as a jury. *See Winchel*, 934 S.W.2d at 950 ("The appellants' problem is that the jury did not accept the appellants' explanation of the evidence, but the weight and value of the evidence lies within the exclusive province of the jury.").

charges incurred on A/C's account for the purchase of warranty parts after the onset of litigation. Jones admitted at trial that he did not attempt to communicate with Lennox about the invoice notations at any time.

A/C and Jones argue that by showing a credit in the "other adjustments" column Lennox manifested an intent to relieve A/C of its alleged debt, thereby waiving its counterclaim. Lennox asserts that the credit shown was simply a bookkeeping notation entered to reflect that A/C was disputing the amount in litigation.

A waiver occurs when a party "with full knowledge of material facts, does something which is inconsistent with the right or his intention to rely on that right. . . . The relinquishment of the right must be intentional." *Lester v. Mount Vernon-Enola Sch. Dist.*, 917 S.W.2d 540, 542 (Ark. 1996) (citations omitted) (alteration in original). We find that no reasonable juror could infer from these facts that Lennox intended to waive its counterclaim. The entries under the "Account Balance" column on each invoice showing that the disputed amount was still due clearly indicate that Lennox continued to seek payment for that amount. Moreover, A/C and Jones proffered no additional evidence of an intent to waive the counterclaim, relying only on the invoices to support their theory. Their waiver argument therefore fails as a matter of law, and the district court did not err in rejecting the proposed jury instruction on this issue.

## VIII. Conclusion

The judgment entered on A/C's Tulsa breach of contract claim is reversed, and the case is remanded to the district court with directions to enter judgment in favor of Lennox on that claim. The judgement entered on Lennox's counterclaim is affirmed in full.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.