ARKANSAS BANK & TRUST COMPANY *v.*
Lee DOUGLASS, Insurance Commissioner of the State of
Arkansas, Arkansas State Association of Life Underwriters

93-1242                                                        885 S.W.2d 863

Supreme Court of Arkansas
Opinion delivered October 31, 1994

*John Dewey Watson, Paul B. Benham III*, and *Robert S. Shafer*, for appellant.

*Jean Langford* for appellees.

*Michael G. Smith* for Intervenors-Appellees, Independent Ins. Agents of Arkansas.

*Candace Franks* for amicus curiae, Arkansas State Bank Dep't.

*Robert M. Clearly, Jr., John Gill*, and *Michael F. Crotty*, for amici curiae, American Bankers Ass'n and Arkansas Bankers Ass'n.

TOM GLAZE, Justice. The appellant Arkansas Bank & Trust Company (ABT) is a state-chartered bank located in Hot Springs. Since its incorporation in 1907, ABT has been in the business of

banking and the selling of full-line insurance policies through ABT Insurance Agency, a division of ABT. Because of a change in insurance law, ABT had to apply for a corporate-agency license which was issued by the appellee insurance commissioner in 1970. ABT was grandfathered under the new statutes prohibiting banks from engaging in full-line insurance business. While the individual employees who sold insurance policies on behalf of ABT were licensed prior to 1970, the insurance department did not issue licenses to corporate-agents prior to 1970.

In 1980, the stockholders of ABT formed ABT Bancshares, a one bank holding company, and transferred all their stock in ABT to Bancshares. As part of the bank, ABT insurance agency became a wholly-owned subsidiary of Bancshares. In 1983, First Commercial Corporation (FCC), a multi-bank holding company, became incorporated. On May 30, 1990, FCC acquired Bancshares by exchanging 1,090,836 of FCC common shares for all of the ABT shares held by Bancshares. As part of FCC, the ABT insurance agency became a part of the multi-bank group.

In 1992, FCC received a notice of hearing from the insurance department, advising ABT that the purpose of the hearing was to determine if the corporate-insurance license issued in 1970 to ABT should be revoked. Appellee Arkansas State Association of Life Underwriters (ASALU) intervened in the administrative proceeding, arguing that ABT's grandfathered license should be revoked as a result of the acquisition of Bancshares by FCC. Following a hearing, the commissioner issued an order permanently revoking ABT's license. ABT appealed to the circuit court of Garland County which affirmed the commissioner without comment. Having obtained a stay of the commissioner's order, ABT brings this appeal. The Arkansas State Bank Department, and the American Bankers and Arkansas Bankers associations have filed *amici curiae* briefs in favor of ABT.

■ Review of administrative agency decisions by both the circuit court and this court is limited in scope. The appellate court's review is directed, not toward the circuit court, but toward the decision of the agency, and the construction of a statute by an administrative agency is not overturned unless it is clearly wrong. *Douglass* v. *Dynamic Enterprises, Inc.*, 315 Ark. 575, 869 S.W.2d 14 (1994). However, where the statute is plain and unambiguous, this court will interpret the statute to mean only

what it says. *Junction City Sch. Dist.* v. *Alphin*, 313 Ark. 456, 855 S.W.2d 316 (1993). In addition, this court will not substitute its judgment for that of the agency unless the agency's decision is arbitrary and capricious. *Dynamic Enterprises, Inc.,* at 575. Finally, the evidence is given its strongest probative force in favor of the agency's ruling, and this court may not reverse the agency's decision if there is any substantial evidence to support its decision. *Id.; Brimer* v. *Ark. Contractors Licensing Board*, 312 Ark. 401, 849 S.W.2d 948 (1993).

In its appeal of the commissioner's decision, ABT relies on the following three points: (1) the statute which the commissioner relied on to revoke ABT's insurance agency license is restrictive of ABT's grandfather rights, penal in nature, in derogation of the common law, and must be strictly construed; (2) ABT has "great grandfather" rights under the statute and may maintain its insurance agency license, notwithstanding the acquisition of ABT Bancshares by FCC; and (3) the statute permits an exempt agency which is also a bank to be acquired by a bank holding company without losing its insurance agency license.

A number of statutory provisions control the issues raised in this cause, the first of which is Ark. Code Ann. § 23-64-203(a) (Supp. 1991)[1], which provides in part as follows:

> For the protection of the people of this state, the commissioner shall not issue, continue, or permit to exist any agent, broker, consultant, or solicitor license as to insurance other than life and disability, except in compliance with this chapter[.]

Further, the commissioner is authorized to promulgate regulations to effectuate the purposes of the statute which are "to help maintain the separation between lending institutions and the insurance business and to minimize the possibilities of unfair competitive and deceptive practices by lending institutions or their subsidiaries or affiliates affecting agents, brokers, or the public." Ark. Code Ann. § 23-64-204(b)(5) (Supp. 1991). These code provisions also contain a general prohibition against the issuance of an insurance license to any lending institution, any subsidiary or

---

[1]Section 23-64-203 was amended in 1993 and is currently found at § 23-64-203 (Repl. 1993).

affiliate of a lending institution, or to any officer or employee of a lending institution in any municipality with a population exceeding five thousand according to the latest federal decennial census. Ark. Code Ann. § 23-64-203(b) (Supp. 1991). In addition to providing exceptions which are not at issue here[2], these code provisions contain a grandfather clause — with certain limitations mentioned — for licensed agents employed in lending institutions. That grandfather clause provision provides as follows:

(1) However, a lending institution, a subsidiary, affiliate, officer, employee, *or the holder of the control of a lending institution* otherwise qualified may be issued a license to:

(C) Successor agents, brokers, and solicitors, who are otherwise qualified, as successors to those agents, brokers, and solicitors who are exempt from the restrictions set out in this section and their successors in turn, *for so long as the lending institution agency with which the successor agent, broker, or solicitor is appointed is continuing to function as it was constituted on March 25, 1975, and no successor agent, broker, or solicitor is permitted to be employed or controlled directly or indirectly by any lending institution agency except that agency for which he was so licensed as a successor.*

§ 23-64-203(b)(1)(C) (Emphasis added). In addition, § 23-64-203(b)(2) provides a qualified grandfather clause for corporate agencies such as ABT as follows:

For the purposes hereof, the subsequent transfer of ownership or control of a lending institution agency to other subsidiaries or affiliates of that lending institution *with which the agency was associated on March 25, 1975,* shall not prohibit the commissioner from granting renewals of or license to successor agents, brokers, and solicitors. (Emphasis added).

And finally, § 23-64-203(b)(3) is a provision acknowledging

---

[2]Despite the statute's general prohibition against licensing lending institutions, the commissioner may issue a license to a lending institution to sell mortgagor's decreasing term life insurance, mortgagor's accident, health and sickness insurance, credit life insurance, credit accident, and credit health and accident insurance. § 23-64-203(b)(1)(A).

grandfathered lending institutions doing insurance business, but also spells out events that could cause such an institution to lose its grandfather status. Section 23-64-203(b)(3) reads as follows:

> *Likewise, nothing in this section shall restrict the expansion* by the appointment of additional agents, brokers, and solicitors, *by the acquisition through purchase or the merger and consolidation of an existing lending institution agency where the agency on March 25, 1975,* was operated as an individual proprietorship, a partnership or, *if a corporate agency its capital stock was not owned by a lending institution and no part of the profits of the agency inured directly or indirectly to the benefit of a lending institution. However, those restrictions relative to the licensing of a lending institution agency, its agents, brokers, and solicitors, shall attach upon the transfer of the agency either by the transfer of ownership or the right of participation in the profits of the agency directly or indirectly to a lending institution.* (Emphasis added).

For purposes of understanding the foregoing statutory provisions, a lending institution is defined as any entity which has a place of business in this state where it accepts deposits of money from the public and lends money, including banks and savings and loan associations. § 23-64-203(b)(4)(A). In addition, control is defined as the power to exercise a deciding influence over the management of a lending institution, unless power is solely the result of an official position with the lending institution. § 23-64-203(b)(4)(E).

First, ABT argues that, because FCC is a holding company and not a lending institution, acquisition of it by FCC did not divest ABT of its corporate-agency license under § 23-64-203(a) and (b) provisions, because those provisions do not address ownership by a holding company. (*But see* § 23-64-203(b)(1) discussed below.) In support of its argument, ABT cites *Glastonbury Co. v. Gillies*, 209 Conn. 175, 550 A.2d 8 (1988), wherein the Connecticut insurance commissioner rescinded a bank subsidiary's, Glastonbury Company's, grandfathered status to sell insurance. Connecticut law prohibited bank subsidiaries from obtaining insurance licenses, but banks lawfully licensed to sell insurance when the law went into effect could continue in the insurance

business. While Glastonbury qualified for grandfathered status, it subsequently sold its insurance business and did not seek relicensing. After ten years passed, Glastonbury was relicensed to sell insurance, but the Connecticut insurance commissioner rescinded the license, stating he had erred. The commissioner explained that Glastonbury lost its exempt status because it failed to hold its license continuously. The trial court disagreed, and the Connecticut Supreme Court upheld the trial court's holding that the Connecticut law was not ambiguous and that the grandfather clauses did not impose a requirement of continuous licensure. In doing so, the Connecticut court held that it must apply statutory enactments according to their plain terms; it concluded that if the state's legislature had desired a continuous licensure requirement, the legislature could have inserted it into the law.

The *Glastonbury* case is readily distinguishable from the present case, if for no other reason than Arkansas's statutory provisions set out above do provide that certain conditions must continue in order for a lending institution to remain licensed to sell insurance. For example, ABT was grandfathered to continue to sell insurance so long as it continued to function as it was constituted on March 25, 1975. *See* § 23-64-203(b)(1)(C). Also, ABT would become subject to the license restrictions to lending institutions if its ownership was transferred or it transferred participation in its profits directly or indirectly to a lending institution. *See* § 23-64-203(b)(1)(C) and -203(b)(3). We turn now to those pertinent facts and evidence bearing on these statutory conditions required for ABT's continued grandfather status.

The Arkansas insurance commissioner found that on May 30, 1990, FCC acquired ABT Bancshares by exchanging 1,090,836 of FCC common shares for one hundred percent (100% of 116,596) of the ABT shares. Bancshares was created solely as a one-bank holding company for ABT's stock, and performed no other functions. Thus, one hundred percent of the ownership of ABT, including the ABT insurance agency, passed to FCC essentially as ABT existed when it was first licensed.

At the time of the transfer to FCC, FCC was a multi-holding company for other lending institutions and ABT became part of that affiliate group, which the commissioner characterized as a "multi-bank or multi-lending group." Management and supervisory authority over the lending institutions within the group,

including ABT, is vested in FCC's "Affiliate Bank Network." As corporate parent of the group, FCC received income from the following two sources: (1) all of its subsidiary lending institutions provided a dividend to FCC in an amount equal to one-half of their pre-tax net earnings in each of the fiscal year's first three quarters, and an adjusted fourth quarter dividend equal to all earnings in excess of seven per cent of capital from each subsidiary, and (2) service fees charged by FCC to its subsidiaries under "service agreements" for necessary services such as loan review, audit, and data processing. In 1991, all profits from the ABT insurance agency in excess of $100,000 were paid to FCC as a dividend which was pooled with dividends paid by the other subsidiaries to benefit the group and FCC's shareholders. Witnesses for ABT admitted that the other lending institutions within the group "indirectly" shared in the profits of the ABT insurance agency.

Finally, the commissioner's findings suggest that FCC functions more like a bank than as a holding company. His findings recited FCC's 1990 Annual Report to Stockholders wherein FCC stated that "[w]hile many financial institutions in other parts of the country are under siege due to severe asset quality problems and resulting strains on liquidity and capital, FCC continues to be one of the safest and soundest banking organizations in the nation." On appeal, FCC fails to show the findings of fact by the commissioner were in error or that the law prevents the commissioner from looking beyond the form of the organization to its substance.

■ This court generally defined "holding company" as "a super-corporation which owns or at least controls such a dominant interest in one or more corporations that it is enabled to dictate their policies through voting power; a corporation organized to hold the stock of other corporations." *Cheney* v. *Stephens*, 231 Ark. 541, 549, 330 S.W.2d 949 (1960) (Citation omitted).[3] In *Cheney*, this court looked to the record and to the articles of incorporation in determining whether Stephens' activities were "merely acts of holding stocks in other corporations" or whether its activities were those of a corporation actively engaged in business. *Id.* at 550.

---

[3]The definition of bank holding company is found in Ark. Code Ann. § 23-64-1802(b) (Repl. 1994); *see also* 12 U.S.C. § 1841(a).

Here, there is substantial evidence to support the commissioner's finding that FCC was actively engaged in more than merely holding stock in its subsidiary lending institutions. Ray Cash, an officer with ABT since 1960, testified that FCC had "infused $6 million plus into ABT." Further, Cash testified that the intent of the merger of FCC and ABT was to achieve "an economy of scale" by the pooling of operations, and that ABT had experienced a reduction in costs as a result. Additionally, Cash testified "we are getting better expertise on some of our loan review areas and some of the other areas, that we didn't have before the merger." Cecil Cupp, Jr., chairman of ABT's board and on FCC's board of directors, testified that even though none of the affiliate lending institutions within the group have a contractual right to obtain dividends and profits from ABT insurance agency, there is indirect participation and benefit by those affiliates through the pooling of dividends. Lynn Wright, Jr., chief financial officer for FCC, testified that the sharing of expenses through FCC's pooled operations "inures to the benefit of each of the subsidiaries as well as the acquired company." Bobby Scott, a CPA, testified that upon review of various documents, he determined that ABT paid a dividend to FCC of $3.4 million in 1991 which was used to pay for the expenses of maintaining the pooled services provided by FCC to its subsidiaries, and that part of the dividend paid by ABT came from profits earned by ABT's insurance agency. Finally, Jake Olson, Vice President and Manager of ABT's insurance agency, testified as follows:

> It used to be that the individual subsidiaries of [FCC] would obtain insurance coverages in their various municipal locations. Now there is a 'consolidation process' ongoing whereby *all of the subsidiaries's insurance business will be placed through our ABT Insurance Agency.* Just the property and liability policy and the Directors and Officers liability policy should add about $540,000 in additional premium for our agency. (Emphasis added).

From the foregoing, it is clear that FCC is actively involved in the business of its affiliate lending institutions, and does more than merely hold their stocks or set policy through its voting power. FCC manages the pooled services, some of which are strictly services performed by a lending institution, such as loan review. Additionally, FCC dictates to the affiliates which ser-

vices are to be pooled and their costs. Further, FCC determines the amount of dividends paid to it, when those dividends are to be paid, and how those are allocated back to the affiliates. Finally, the ABT insurance agency is to be used as a pool resource for the affiliates' insurance needs under FCC's management.

■ The language of § 23-64-203(b) is clear and unambiguous, as indeed ABT concedes. With the 1990 merger, ABT changed from a corporation with its stock held by a shell corporation, Bancshares, to a subsidiary of a parent corporation actively involved in the business of its lending subsidiaries. The exchange of all of ABT's shares for 1,090,836 common shares of FCC's stock was a transfer of ownership and control. Further, FCC was actively involved in the business of its lending subsidiaries. Finally, the stock transfer resulted in the use of ABT insurance agency profits to benefit ABT's affiliate lending institutions, and the right of those affiliates to participate in the profits of the agency indirectly through the pooled services and allocation of dividends controlled by FCC.

Next, in addition to its grandfather clause argument involving § 23-64-203(b) just discussed, ABT argues another provision, § 23-64-203(c), not yet mentioned, but through which it claims ABT was "great grandfathered." Provision 203(c) provides as follows:

> Notwithstanding the requirements contained in subsections (a) or (b) of this section, the commissioner may renew or continue the license of persons who, as of immediately prior to January 1, 1960, were lawfully licensed as agents or solicitors under laws then in force. All the licenses shall, however, be subject to the other applicable provisions of this code.

The commissioner held that: (1) this subsection was unavailable to ABT since it held no license prior to January 1, 1960, and no license was available to any corporate agency at that time; (2) the renewal of licenses under the subsection was discretionary and not binding on him; and (3) the subsection must be resolved within the interpretation of subsections (a) and (b) which were enacted in 1975.

The commissioner, in attempting to harmonize provisions § 203(a), (b) and (c), stated the following:

> [T]he Legislature intended to prohibit the Insurance Commissioner from continuing the agent's license of any subsidiary or affiliate of a lending institution . . . with certain exceptions and caveats, including the "grandfathering" of certain agencies[.] It is equally clear when reading A.C.A. § 23-64-203 as a whole, and consistent with the purposes expressly set forth, that the Commissioner must view this entire area of banking and insurance relationships conservatively and with a leaning toward *restricting* rather than *promoting* the dangers perceived by the Legislature as being posed to the public by lending institution agencies. . . . It is manifest that overall thrust of the legislation is to "freeze" the grandfathered lending institution agencies in the form that they existed on March 25, 1975.

(Emphasis in the original).

ABT's response to the commissioner's ruling on this point is that even if it loses its license under the other subsections of 203(a) and (b), this "great grandfather clause" under 203(c) saves it. While acknowledging it had not been granted a corporate license until 1970, ABT argues it had received a constructive license through its licensed employees in 1931 which continues through their successors to the present day. ABT argues that to interpret 203(c) any differently, and to require of it an express condition of holding an license at a time when corporate licensing was not available would deprive ABT of due process. Finally, ABT argues that the application of 203(c) to the circumstances in this case is not discretionary with the commissioner.

While distinguishable in part, this court addressed a similar issue in *Simpson* v. *Monette State Bank*, 238 Ark. 314, 381 S.W.2d 442 (1964). There, the bank commissioner instituted a declaratory action to determine whether a teller's window operated by Monette Bank in another town could be forced to close and terminate business because a locally owned and full-service bank began doing business in the same town. At issue was a 1963 statutory provision that stated that no teller's window "shall be continued at any place after a legally chartered bank has actually commenced business at that place." *Id.* at 315. The bank argued that a grandfather clause enacted in 1961 allowed teller's windows already in operation to continue to operate despite enact-

ment of the 1963 statutory provision providing otherwise. Additionally, the bank argued that the grandfather clause gave it a vested right to continue the operation of its teller's window. In rejecting the bank's arguments, this court found a history of the legislation confirmed a consistent attitude of the legislature in encouraging organization and ownership of local banks by requiring the closure of teller's windows when local banks were chartered. In rejecting the bank's arguments, this court held such legislation was within the proper sphere of the state's inherent police power. Further, because banking by corporation is only a privilege, the bank never possessed more than a conditional privilege which was constantly susceptible to immediate revocation. This view, too, is consistent with the discretionary language contained in 203(c) wherein the commissioner is instructed he "may" renew the license on persons who were licensed prior to January 1, 1960.

Like corporate banking, the business of insurance is subject to the mood of the legislature and is regulated by the Arkansas Insurance Code. *But see* Ark. Code Ann. §§ 23-60-103—104 (Repl. 1994) for exceptions. Any privilege previously granted by statute is subject to revocation by legislative amendment of the code.

Here, the commissioner found that the lending institutions within FCC have "the sort of 'indirect' right to participate in profits spoken of in the second sentence of § 23-64-203(b)(3) which, necessarily, means that its 'full line' grandfather protection must be lost." Looking to the substance of the transactions between ABT and FCC rather than to the form and ignoring Bancshares as a corporate shell, the commissioner found that neither First Commercial Bank nor any of the other lending institutions within FCC could have directly purchased ABT without voiding ABT's grandfather protection. Thus, the commissioner held that the indirect sharing of profits between the lending institutions within the FCC network resulted in a violation of the legislative intent to restrict ownership of full-line insurance agencies by lending institutions pursuant to § 23-64-203(b).

Next, ABT argues that based on the language of § 23-64-203(b)(3), it is exempted from the prohibition of the statute because neither Bancshares nor FCC are lending institutions within the definition provided in § 23-64-203(b)(4)(A). It argues

neither Bancshares nor FCC accepts deposits of money from the public or lends money. Further, ABT argues that none of FCC's subsidiaries have a right of participation in the profits from ABT including those of its insurance agency. ABT avers that the right to share in its profits flows up to its parent, FCC, and it is FCC which determines where those profits go and not the affiliates. Further, a dollar from ABT going to FCC cannot be traced to any other affiliate since the profits are pooled. Additionally, ABT argues the commissioner was wrong in piercing the corporate veil based strictly on public policy. Finally, ABT argues the commissioner misinterpreted § 23-64-203(b)(3) as a divestiture provision.

We previously touched upon ABT's contention that the commission erred in piercing the corporate veil. However, it is necessary to discuss further the specific argument and authority put forth by ABT. In support of its argument, ABT cites *Woodyard* v. *Ark. Diversified Ins. Co.*, 268 Ark. 94, 594 S.W.2d 13 (1980), where the subsidiary challenged piercing the corporate veil. There, the commissioner had ignored the corporate form of subsidiaries and found them essentially being used to avoid the effects of the statutes in issue by the parent corporation. In upholding the commissioner's decision, this court stated that courts will ignore the corporate form of a subsidiary where fairness demands it. Further, this court stated that usually, this substance-over-form evaluation will occur where it is necessary to prevent wrongdoing and where the subsidiary is a mere tool of the parent. Here, ABT argues that *Woodyard* limits the commissioner's ability to pierce the corporate veil to those cases in which there are specific findings that FCC and its subsidiaries have ceased functioning as separate entities or that the subsidiaries are being used to promote fraud.

■■ First, ABT reads this court's decision in *Woodyard* too narrowly. As previously noted, the *Woodyard* court stated that courts will ignore the corporate form where "fairness" demands it. The court added that, usually, this will be where it is necessary to prevent wrongdoing and where the subsidiary is a mere tool of the parent. Here, ABT's own evidence showed that the form of the merger and FCC's corporate structure resulted in the sharing of ABT insurance agency profits by other lending institutions. Thus, the corporate form allowed the subsidiaries and FCC to do indirectly what they could not do directly. No fraud was

alleged on either FCC's or ABT's parts but none is required. In the circumstances described here, we hold the commissioner was correct in looking beyond the corporate form to the substance of the relationships between FCC and its subsidiaries.

■ Next, ABT challenges the commissioner's interpretation of § 23-64-203(b)(2) wherein the commissioner held that this subsection allows "the reorganizations and continuance of the grandfather status whenever there is a transfer of the lending institution agency to any other subsidiary or affiliate of the lending institution as they were in place on March 25, 1975." Section 23-64-203(b)(2) provides:

> For the purposes hereof, the subsequent transfer of ownership or control of a lending institution agency to other subsidiaries of affiliates of the lending institution with which the agency was associated on March 25, 1975, shall not prohibit the commissioner from granting renewals of or license to successor agents, brokers, and solicitors.

Under the commissioner's interpretation, ABT was divested of its grandfathered status when Bancshares merged with FCC in 1990, since ABT had not been associated with FCC or the affiliate lending institutions within the FCC network on March 25, 1975. Considering the plain terms of § 23-64-203(b)(2), we hold the commissioner's interpretation of this subsection is correct.

■ Finally, ABT argues that, since holding companies are not mentioned in the statute, the legislature did not intend that the transfer of a lending institution agency to a holding company divests the agency of its grandfather status. Of course, our discussion concerning piercing the corporate veil answers this argument. Nonetheless we would also point out the introductory language to those provisions grandfathering or otherwise exempting certain persons or entities from being denied a license which reads as follows:

> However, a lending institution, a subsidiary, affiliate, officer, employee, *or the holder of the control of a lending institution* otherwise qualified may be issued a license to:

(§ 23-64-203(b)(1)) (Emphasis added). While the above language

is the only place in § 23-64-203 where "the holder of the control of a lending institution" is mentioned, it would seem that the commissioner's conclusions of law are correct that holding companies merely holding controlling stock in another lending institution are contemplated as being included within the meaning of § 23-64-203.

In conclusion, we find the commissioner's order is thorough and his reasoning is clear. Based on the foregoing discussion and the plain language of the statute, the commissioner's decision was not arbitrary or capricious, and substantial evidence exists to support his decision.

Affirmed.

BROWN, J., dissents.

ROBERT L. BROWN, Justice, dissenting. No one disagrees that the public policy has now been set in this state to separate banking institutions and insurance companies. The question before us, though, is whether the statutes in effect in 1990 required that separation in the case of Arkansas Bank & Trust Company (ABT). I do not believe that they did.

The statutory language which was effective in 1990 and on which this case turns reads:

> However, those restrictions relative to the licensing of a lending institution agency, its agents, brokers, and solicitors, shall attach upon the transfer of the agency either by the transfer of ownership or the right of participation in the profits of the agency directly or indirectly to a lending institution.

Ark. Code Ann. § 23-64-293(b)(3) (Supp. 1991).

In 1980, ABT, which had an insurance agency as a component, was transferred to a one-bank holding company, ABT Bancshares Corporation. In 1990, ABT Bancshares Corporation was acquired by a multi-bank holding company, First Commercial Corporation (FCC). FCC is paid dividends and service fees by its bank subsidiaries including ABT Bancshares and provides management expertise and administrative services in return. The question then is whether this acquisition by FCC constituted a

transfer enabling a bank to participate directly or indirectly in the profits of the insurance agency. If so, that would require FCC to divest itself of the insurance agency.

FCC is not a lending institution. A lending institution is defined as "any entity which has a place of business in this state, at which place it accepts deposits of money from the public and lends money, including banks and savings and loan associations." Ark. Code Ann. § 23-64-203(b)(4)(A) (1987). FCC clearly does not fit under this definition. It is a bank holding company. So the transfer of ABT Bancshares Corporation to FCC is not a transfer to a lending institution under § 23-64-293(b)(3) (Supp. 1991). That leaves the other bank subsidiaries of FCC. They are lending institutions but was a transfer made to them? Stated differently, do they participate directly or indirectly in the profits of the insurance agency because of the transfer to FCC? Surely they do not participate directly in the agency's profits, and the Insurance Commissioner admitted this. Nor, to my way of thinking, do they *participate* indirectly in the agency's profits.

The Insurance Commissioner adopted a contorted theory that the service fees paid to FCC by the subsidiary banks are subsidized by ABT Bancshares's dividend paid to FCC which is derived in part from insurance agency profits. This amounts to a participation by those banks in the insurance agency's profits, according to the theory. I disagree with this convoluted reasoning. Again, all subsidiary banks as well as ABT Bancshares pay a dividend to the holding company as well as service fees for managerial services such as loan review, audit, and data processing. The money is pooled. All subsidiaries benefit from the reduced service fees, but that is a far cry from indirect participation in another subsidiary's profits under anybody's definition.

The majority opinion goes on to say that the statute in effect at the time of the transfer of Arkansas Bancshares to FCC in 1990 embraced transfers of insurance agencies to bank holding companies. But if that were the case, why did the General Assembly find it necessary to amend this statute in 1993 in order to clarify it? By Act 592 of 1993, now codified at Ark. Code Ann. § 23-64-203(b) (Repl. 1994), the General Assembly included transfers to "affiliates" for the first time as grounds for causing

the divestiture of a grandfathered insurance agency. "Affiliate" is defined under Act 592 as an entity which controls a lending institution. That means a holding company now would easily qualify. The Emergency Clause attached to Act 592 says that the reason for the legislation is that the law is "in urgent need of clarification." Furthermore, Act 592 is clearly prospective in application as it says it will apply only to transfers effected after January 1, 1993.

Act 592 would require the result reached by the majority, but that Act was not effective in 1990. In 1990, holding companies, as affiliates, were not prohibited "participants" under the statute — only lending institutions were. What the majority opinion does is disregard the bank holding company structure in effect in 1990. I would reverse the order of the circuit court.