## Dr. Chris CULPEPPER *v.* The ARKANSAS BOARD of CHIROPRACTIC EXAMINERS

00-177 36 S.W.3d 335

Supreme Court of Arkansas
Opinion delivered February 1, 2001

*Perroni & James*, by: *Patrick R. James* and *Janan Arnold Davis*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Ainsley H. Lang* and *Brian G. Brooks*, Ass't Att'ys Gen., for appellee.

W.H. "DUB" ARNOLD, Chief Justice. This appeal challenges a decision by the Arkansas Board of Chiropractic Examiners (the Board) holding the appellant, Dr. Chris Culpepper, in violation of a Board regulation prohibiting certain contact with prospective patients when Dr. Culpepper utilized the services of a telemarketing firm for purposes of building his clientele. At issue in this case is whether Dr. Culpepper violated a Board regulation proscribing in-person solicitation of potential clients, and, if so, whether the regulation itself violated the federal Constitution or federal antitrust law. This appeal was filed pursuant to the Arkansas Administrative Procedure Act, Ark. Code Ann. § 25-15-201 (Supp. 1999), *et seq.*, following a finding by the Board that Dr. Culpepper had violated the regulation. The Circuit Court of Pulaski County

upheld the decision of the Board. We reverse, holding the regulation in question to be an unconstitutional infringement on commercial speech, in violation of the First Amendment.

Appellant Chris Culpepper, d/b/a Liberty Chiropractic Clinic, is a sole practitioner chiropractor licensed to practice in the State of Arkansas; his clinic is located in Little Rock. Appellant utilized, among other marketing tools, the services of Physician's Assistance Group ("PAG") in an effort to build his clientele. PAG is a professional telemarketing company hired by appellant to inform the public of his availability. PAG's employees would access accident reports from the area in which Dr. Culpepper practices; they would then make telephone calls to individuals who had been involved in those accidents and attempt to entice the accident victim into scheduling an appointment with him. These calls would come the day or days following the accident. The Board reviewed three reported specific incidents where this practice occurred.

The Board found that this practice violated its regulation proscribing "unprofessional acts." The relevant portion of the regulation defines an unprofessional act as:

> Direct contact with prospective patients by in-person or live telephone communication the purpose of which being to solicit professional employment from a prospective patient with whom the chiropractic physician has no family or prior professional relationship when a significant motive of the chiropractic physician's communication and/or contact is the chiropractic pecuniary gain.

Part Two, Rules and Regulations of the Arkansas State Board of Chiropractic Examiners, Regulation C(2)(q) ("Regulation Q"). The Board fined Dr. Culpepper $3,000.00 and placed him on a one-year probation with the condition that he cease his solicitation through an outside agent. Dr. Culpepper challenged this finding; and, as stated above, the circuit court affirmed the Board's decision and further found that Regulation Q does not violate the First or Fourteenth Amendments to the Constitution.

On appeal, Dr. Culpepper asserts the following:

1) The regulation is in violation of the First Amendment to the United States Constitution [as an unconstitutional infringement on commercial speech];

2) The rule [regulation] is in violation of the Equal Protection Clause of the Fourteenth Amendment;

3) The Board's decision to find Dr. Culpepper in violation of the Board's rules was not supported by substantial evidence and was arbitrary and capricious [*i.e.*, his actions did not violate the Regulation];

4) Regulation Q constitutes an unfair restraint of competition [trade].

## Standard of Review

■ Decisions of the Arkansas State Board of Chiropractic Examiners are subject to the Arkansas Administrative Procedure Act (A.P.A.) Ark. Code Ann. § 25-15-201, *et seq.* The Arkansas A.P.A. allows this Court to review the decision of the administrative agency notwithstanding the decision rendered by the circuit court, whose review is limited in scope by Ark. Code Ann. § 25-15-212(h) (Supp. 1999). *Ford v. Keith*, 338 Ark. 487, 996 S.W.2d 20 (1999).

■ In an appeal from an administrative order, our review is directed to the agency's decision, not the circuit court's. *Hankins v. Department of Finance and Administration*, 330 Ark. 492, 954 S.W.2d 259 (1997). When reviewing administrative decisions, we will review the entire record to determine whether there is any substantial evidence to support the administrative agency's decision, whether there is arbitrary and capricious action, or whether the action is characterized by abuse of discretion. *Wright v. Arkansas State Plant Board*, 311 Ark. 125, 130, 842 S.W.2d 42 (1992). We recognize that

> administrative agencies are better equipped than courts, by specialization, insight through experience, and more flexible procedures to determine and analyze underlying legal issues affecting their agencies, and this recognition accounts for the limited scope of judicial review of administrative action and the refusal of the court to substitute its judgment and discretion for that of the administrative agency.

*Wright*, 311 Ark. at 130. As such, the administrative agency is afforded great deference.

■ Evidence is given its strongest probative force in favor of the agency's ruling, and we will not reverse an agency decision when there is substantial evidence to support it. *Arkansas Bank & Trust Co. v. Douglass*, 318 Ark. 457, 885 S.W.2d 863 (1994). To determine whether a decision is supported by substantial evidence, we review the entire record to ascertain if it is supported by relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Wright, supra (citing Livingston v. Arkansas State Medical Bd.*, 288 Ark. 1, 701 S.W.2d 361 (1986); *Partlow v. Arkansas State Police Comm'n*, 271 Ark. 351, 609 S.W.2d 23 (1980)).

### First Amendment Violation

■ ■ Appellant asserts that Regulation Q is an unconstitutional infringement on commercial speech in violation of the First Amendment. We agree. Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557 (1980). The United States Supreme Court has held that "the First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation." *Id.*

In *Central Hudson*, the Court also explained that:

> [T]he First Amendment's concern for commercial speech is based on the informational function of advertising. Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it, commercial speech related to illegal activity.

> If the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed. The State must assert a substantial interest to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State's goal. Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the

regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.

*Id.* (internal citations omitted). The Supreme Court has explained that a restriction on commercial free speech must be "narrowly tailored to achieve the desired objective." *Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995).

In *Central Hudson*, the Court outlined a four-pronged test to apply to regulations that restrict commercial speech. Specifically, it held:

In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson,* 447 U.S. at 566.

The Court has also noted that when evaluating a challenge to a restriction on commercial speech "[t]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it. This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real, and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761 (1993).

In the instant case, appellee, a State agency, has implemented guidelines for chiropractic physicians. Included within these regulations is Regulation Q. Both appellant and appellee agree that this regulation is a restriction on commercial speech. Additionally, both appellant and appellee agree that appellant's solicitation of potential patients through PAG was not misleading. However, the parties disagree as to whether the regulation is a violation of appellant's First Amendment right pursuant to the *Central Hudson* test. Thus,

it is necessary for us to apply the four-pronged analysis in the form of "intermediate scrutiny" established by *Central Hudson* to the regulation now before this court.

▪ First, the regulation must concern a lawful activity and not be misleading. *See, Central Hudson supra.* As was previously discussed this prong is not challenged by the parties. Next, we must determine whether the governmental interest is substantial. *See Central Hudson, supra.* In *Cambiano v. Neal*, 342 Ark. 691, 35 S.W.3d 792 (2000), we noted that, generally, states have a strong interest and a right to regulate professions within their boundaries, and they bear "a special responsibility for maintaining standards among members of the licensed professions." *Cambiano* (quoting *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 460 (1978). In addition, appellee has asserted the following interests: (1) protecting the tranquility and privacy of the home; (2) protecting people from overreaching and pressure at a time when their judgment may be impaired by medication and trauma form a recent accident; (3) the State's interest in establishing standards for licensing and regulating professional practitioners of chiropractic medicine in such a way as to protect the reputation of the profession: and, (4) the State's interest in reducing unnecessary medical treatment, reducing insurance costs and protecting citizens from possible overreaching by health care providers attempting to influence people to seek medical aid. Appellant does not challenge appellee's articulated governmental interests.

▪ Next, we must determine whether Regulation Q directly advances the governmental interests asserted. *See, Central Hudson, supra.* This requirement was discussed by the Supreme Court in *Went For It, supra.* The United States Supreme Court explained that:

> [T]he State must demonstrate that the challenged regulation advances the *Government's interest in a direct and material way. That burden, we have explained, is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.*

> In *Edenfield,* the Court invalidated a Florida ban on in-person solicitation by certified public accountants (CPAs). We observed that the State Board of Accountancy had *"present[ed] no studies that suggest personal solicitation of prospective business clients by CPAs creates*

*the dangers of fraud, overreaching, or compromised independence that the Board claims to fear." Moreover, "[t]he record [did] not disclose any anecdotal evidence, either from Florida or another State, that validate[d] the Board's suppositions."* Finding nothing in the record to substantiate the State's allegations of harm, we *invalidated the regulation.*

*Went For It, supra* (internal citations omitted) (emphasis added).

Applying this language to the case now before us, we hold that Regulation Q does not withstand *Central Hudson* scrutiny, as appellee has failed to present specific information which details how Regulation Q furthers the articulated governmental interests. Appellee has not presented the necessary empirical evidence to support its alleged governmental interests at any stage of this case. Specifically, appellee failed to present studies or testimony of how such a restriction on in-person solicitation will advance the governmental interests in a direct and material way. While the State did present some limited anecdotal evidence to support the necessity of the regulation, anecdotal evidence was likewise presented for the opposing view. We hold, therefore, that appellee has failed to meet its burden of proof that Regulation Q will directly and materially advance the governmental interests asserted.

We further hold that Regulation Q is not sufficiently "narrowly tailored" to protect the governmental interests asserted without overly burdening appellant's First Amendment rights. In fact, the Board obtained anecdotal evidence *after* Regulation Q was promulgated; therefore, that evidence could not have been used by the Board to "narrowly tailor" the regulation to advance the asserted governmental interests without burdening appellant's First Amendment rights. We hold that it is not sufficiently tailored and is more extensive than necessary. Several other jurisdictions have addressed this issue, and we turn to them for guidance.

First, in *Bailey v. Morales*, 190 F.3d 320 (5th cir. 1999), the Fifth Circuit Court of Appeals reviewed a Texas regulation which restricted the commercial speech of chiropractors. The regulation prohibited "chiropractors and other professionals from soliciting employment, in person or over the telephone, from individuals who have a special need for chiropractic services arising out of a particular occurrence." The act also prohibited "solicitation via runners or telemarketing and by distributing promotional gifts and items." Bailey, a licensed chiropractor, sought an injunction and declaratory relief arguing that the regulation violated his First

Amendment rights. The Fifth Circuit, after applying the *Central Hudson* test to the regulation, held:

> [W]e conclude that this section is neither reasonably tailored nor reasonably proportional to the harm the State seeks to prevent. It is not limited to in-person or telephonic solicitation of an injured or ill person; rather, this section facially applies to any advertising, including advertising via public media, that offers money or anything of value (e.g., a free adjustment) to induce a client to try chiropractic services. The section is not bounded by a time limit (such as *Went For It*'s 30 day moratorium) or target group (for instance, *Went For It*'s recent victims of accidents). And the section criminalizes commercial speech that is both unobjectionable and unquestionably protected by the first amendment (e.g., a print advertisement offering a free adjustment to anyone interested).

*Bailey, supra.* Because the regulation was not narrowly tailored, the court thereafter concluded that the regulation was unconstitutional. *Id.*

Additionally, the Louisiana Supreme Court had occasion to review a restriction on commercial speech in *Gregory v. Louisiana Board of Chiropractic Examiners*, 608 So. 2d 987 (1992). The regulation in *Gregory* stated:

> A. A health care provider or person designated, contracted, or paid by the health care provider, shall not directly solicit by phone or mail, patients or potential patients who, because of their particular circumstances, are vulnerable to undue influence. Circumstances in which patients or potential patients may be considered to be vulnerable to undue influence include but are not limited to:
>
> (1) When a person is known to the health care provider to have recently been involved in a motor vehicle accident.
>
> (2) When a person is known to the health care provider to have recently been involved in a work-related accident.
>
> (3) When a person is known to the health care provider to have recently been injured by another person or as a result of another person's actions.
>
> B. Nothing in this Section shall be construed to prohibit advertising, except that which is false, misleading, or deceptive, nor to prohibit outreach services for prenatal, postpartal, child health care, and communicable disease control.

*Gregory, supra.* The Louisiana court reviewed the numerous Supreme Court cases, including *Central Hudson*, and held that:

[I]n the present case, abuses can·be controlled and mistakes can be prevented by less restrictive means than a blanket ban on direct mail solicitations which are targeted at recent accident victims. While the state is not required to use the least restrictive means of regulating commercial speech, the state is required to choose a reasonable means of regulation which is in proportion to the interest that is served. Written information about chiropractic services can be presented in a nondeceptive manner, and the state may only impose restrictions reasonably necessary to prevent deception. *In re R.M.J.*, 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982). The interference with commercial speech in the statute at issue is broader than is necessary to prevent the evil feared by the Board. Although telephone solicitation is in-person solicitation and a total ban on such solicitation may be permissible, such an extensive restriction on targeted direct mail solicitation is not.

*Gregory, supra. See also, Silverman v. Walkup*, 21 F. Supp. 2d 775 (E. Dist. Tenn. 1998).

 We hold that Regulation Q, like the regulations in *Bailey* and *Gregory*, is not sufficiently narrowly tailored. Regulation Q is an absolute prohibition of a chiropractor's commercial speech. If Regulation Q was enacted to battle the governmental interests articulated by appellee, it could have been more narrowly drawn. For example, the regulation could have put a time restriction upon which solicitation was prohibited or the regulation could have identified a target group, such as accident victims, which could not be solicited. However, Regulation Q virtually has no parameters, nor does it offer any exemptions from the absolute ban on direct in-person contact. The type of broad "prophylactic rule" found in Regulation Q violates an individual's right to freedom of speech. *See, Bailey, supra.* Thus, we hold that Regulation Q was not narrowly tailored to achieve the articulated State interests; as such, we invalidate the regulation. Having held that Regulation Q violates appellant's First Amendment rights and reversing the case, as a result, it becomes unnecessary to address appellant's remaining points on appeal.

Reversed.