**Lance SILVERMAN, D.C.,
Plaintiff—Appellee,**

v.

**Paul G. SUMMERS, in his official capacity as Attorney General of the State of Tennessee; Tennessee Board of Chiropractic Examiners Defendants—Appellants.**

No. 98–6476.

United States Court of Appeals,
Sixth Circuit.

Dec. 28, 2001.

Before BATCHELDER, COLE, and GIBSON,* Circuit Judges.

GIBSON, Senior Circuit Judge.

Paul G. Summers and the Tennessee Board of Chiropractic Examiners appeal from the preliminary injunction entered by the district court barring the enforcement

* The Honorable John R. Gibson, Senior Circuit Judge of the United States Court of Appeals

for the Eighth Circuit, sitting by designation.

of Tennessee Code Annotated § 63–4–114(5) (Supp.2000), which prohibits in-person or telephone solicitation of a patient with whom a chiropractor or his agent has had no family or prior professional relationship, on the ground that the prohibition violates the First Amendment. The district court held that the statute fails to draw a distinction between soliciting and advertising and that it is not sufficiently narrowly drawn to pass constitutional muster. Summers and the Board argue that the district court erred in its construction of the statute, that it is narrowly tailored to fit legitimate objectives, and that the district court abused its discretion in granting the preliminary injunction. We affirm.

## I.

Silverman's complaint alleges that he is a doctor of chiropractic who moved to Hamilton County, Tennessee in 1996 to establish a practice in partnership with another chiropractor. Neither he nor his partner had any client base or friends or family in the area; they had simply "fallen in love with" the City of Chattanooga. Silverman attempted to attract patients through a variety of means: striking up personal conversations with individuals, to advise them of the availability and benefits of his services; handing out business cards in areas of high pedestrian traffic; speaking to potential patients who would visit educational booths at health fairs; addressing groups through speaking engagements at various public events; and telemarketing to advise the public of his availability.

Silverman also utilized general advertising through telephone yellow pages, newspaper and radio. However, he found such advertising less beneficial to the public and to the development of his business than the other means of solicitation he em-

ployed. According to Silverman, the benefits of direct solicitation were three-fold; his personal and telemarketing efforts allowed him to convey more information and to interact with the prospective patients because he could convey information in response to their questions; direct solicitation benefitted the public more than general advertising because people are generally more likely to seek treatment in response to the former than the latter; and personal contact and telemarketing were more beneficial to his business than general advertising because they yield more patients at a far lower cost.

Section 63–4–114(5) was amended to its current form in 1998. Following the amendment, Silverman stopped directing his personal and telephone solicitations to anyone except relatives and members of his family because he feared criminal prosecution or possible revocation of his license. His business dropped substantially, and he brought this action to enjoin enforcement of the statute as a violation of his rights under the First Amendment to the United States Constitution and to obtain declaratory relief and money damages.

The district court issued a temporary restraining order blocking enforcement of the statute and held a hearing on Silverman's application for a preliminary injunction. At the hearing, Summers and the Board presented evidence concerning "accident telemarketing"-calls directed to people whose names appear on automobile accident reports. Two accident victims testified, both of whom were contacted by telemarketers acting on behalf of Silverman. Tara Durham received a call from a telemarketer named Mark Cornelius who questioned her about her symptoms and told her that she needed to see Dr. Silverman, whom Cornelius identified as a back specialist. According to Durham, Cornelius

told her that the service would be free because Silverman's fees would be billed to the other driver's insurance company. She visited Silverman four times following the call, but she discontinued the treatment because she experienced pain during her last visit. Silverman did bill her for his services and attempt to collect from her, but the matter was later dropped after Silverman discussed the situation with a state fraud investigator.

Donna Frizzell received a call two days after her car accident from someone who suggested that she call Mark Cornelius who was with "the insurance company." When she called Cornelius, she was taking prescription medications that made her groggy and unable to think clearly. Cornelius was concerned and questioned her about her injuries and about the accident. While they were talking, Cornelius put her on hold and then returned to say that he had made an appointment for her with Silverman for the following day and that she had to go. He identified Silverman as a trauma chiropractic specialist. When Frizzell asked if his insurance company would pay for the services, Cornelius said he was not with an insurance company, but rather with the "Accident Safety and Health Association." She did not keep her appointment and Cornelius called again to try to get her to see Silverman.

Summers and the Board also submitted affidavits of four other individuals who described similar situations. In addition, they submitted considerable anecdotal evidence in the form of newspaper articles telling of telemarketing techniques employed on behalf of chiropractors and directed to recent accident victims. Victims had been urged to have immediate free examinations to uncover dormant injuries. The articles reported that many of those contacted expressed anger at having their privacy invaded by chiropractors and telemarketers who had obtained personal information from the accident reports. They also complained of feeling pressure to see a chiropractor at a time when their judgment was clouded by trauma.

Silverman also testified and presented evidence at the hearing. He described all of the efforts he had employed to attract patients, from personal conversations to print advertising to telemarketing. He testified that he had used telemarketing firms that he found through advertising in chiropractic journals, and that he always asked for and obtained scripts of their sales pitches before agreeing to use their services. He never had any indication that a telemarketer would make representations regarding a nonexistent affiliation with an insurance company, and he would have "fired them immediately" if he had learned of such deception.

Following the hearing, the district court issued a preliminary injunction enjoining the state from enforcing section 63-4-114(5). The remaining issues were scheduled to be heard several weeks after the court issued the injunction, but that hearing was obviated when Summers and the Board proceeded with this appeal.

## II.

We review the district court's entry of a preliminary injunction for abuse of discretion. *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross and Blue Shield Ass'n,* 110 F.3d 318, 322 (6th Cir.1997). We afford great deference to the district court's decision and reverse only if it contains clearly erroneous findings of fact or incorrect legal standards. *Id.* The district court must consider and balance four factors in ruling on an application for a preliminary injunction: 1) whether the plaintiff has a strong likelihood of success on the merits; 2) whether the plaintiff would suffer irreparable injury in the absence of

the injunction; 3) whether the injunction would cause substantial harm to others; and 4) whether the injunction would serve the public interest. *Sandison v. Michigan High School Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir.1995). The district court determined that Silverman had a strong likelihood of succeeding on his constitutional challenge, that the deprivation of his First Amendment rights would constitute irreparable injury, and that preventing enforcement of the statute would not cause harm to others or be detrimental to the public interest.

Summers and the Board argue that the district court erred in concluding that there was a strong likelihood that Silverman would prevail on the merits of his constitutional challenge. In arriving at that conclusion, the district court rightly looked to the test set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), to determine if Silverman's commercial speech is being unconstitutionally restricted. Under that test, the regulation will be allowed to stand if the government's asserted interest in restricting the speech is substantial, if the regulation advances the asserted interest, and if it is narrowly drawn to serve that interest. *Central Hudson*, 447 U.S. at 564–66.

The parties disagree as to what conduct the statute prohibits, and therefore we must first examine the language to determine the statute's scope before we can apply the *Central Hudson* test. Section 63–4–114(5) proscribes:

> Solicitation, in person or by live telephone contact, by a licensee, or by an agent, servant, employee, or independent contractor of a licensee, of a patient with whom a licensee has no family or prior professional relationship; however, this shall not prohibit solicitation by targeted direct mail advertising or other forms of written, radio, or television advertising; provided, that the advertising does not involve coercion, duress, or harassment and is not false, deceptive or misleading[.]

Summers and the Board contend that the statute distinguishes between soliciting and advertising, leaving advertising mostly unrestricted, and that Silverman's activities in passing out business cards, conversing with people on the street, setting up booths at health fair malls, and engaging in public speaking constitute advertising. The only conduct they identify as "solicitation" is telemarketing. While they cannot point to any language in the statute to support their categorizations or the distinction between "solicitation" and "advertising," Summers and the Board rely on other sources of support: dictionary definitions of the two words; the Board's rules on advertising; a statement by the Judicial Council of the American Medical Association distinguishing between the two; and the Tennessee Supreme Court's Code of Professional Responsibility.

Silverman, in contrast, views section 63–4–114(5) as prohibiting all of the activities listed above. In his words, the statute's message to chiropractors is "thou shalt not talk." He argues that the statute establishes a blanket ban on all communications seeking to drum up business except for communications to persons with whom the chiropractor has a family or prior professional relationship, and targeted direct mail or other written, radio, and television advertising.

We conclude that Silverman correctly sets forth the statute's meaning. Section 63–4–114(5) provides a blanket prohibition on solicitation in all but two instances. The first instance is dependent on who is being solicited-a chiropractor is allowed to solicit business from a family member or

someone who already has been a patient. The second instance is dependent on the type of communication-"solicitation by targeted direct mail advertising or other forms of written, radio, or television advertising" is allowed. One cannot conclude that the statute distinguishes between "solicitation" and "advertising" when it refers to advertising as a type of solicitation. As the district court noted, to find such a distinction "is not possible without contorting [the statute's] language beyond all reason."

While we acknowledge the maxim urged by Summers and the Board that we are to strive to construe state statutes to avoid a determination that they are unconstitutional, that maxim does not give us license to rewrite the legislature's language or to "press statutory construction to the point of disingenuous evasion." *Salinas v. United States,* 522 U.S. 52, 60, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (citations omitted). If we were to adopt the construction urged by Summers and the Board, the resulting version would be "cherry picked" to create an exception not contained in the language so as to avoid constitutional infirmity. *Bailey v. Morales,* 190 F.3d 320, 324 (5th Cir.1999).

We turn now to our review of the district court's grant of the preliminary injunction. Silverman does not dispute the district court's conclusion that the interests asserted by Summers and the Board are substantial and that the statute addresses those issues. Consistent with their theory that telemarketing is the only proscribed conduct, Summers and the Board assert that the interests served by the statute include protecting the privacy of accident victims, preventing overreaching by chiropractors and their agents, and regulating the profession. The district court correctly concluded that each is a valid state interest, *Bailey,* 190 F.3d at 323, but even a single substantial interest is enough to satisfy the first requirement of the *Central Hudson* test. *Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 624 n. 1, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). The district court also correctly concluded that the statute's prohibition on speech is an effective way of addressing the asserted interests.

The parties chiefly disagree in their analyses of potential overbreadth, the third element of the *Central Hudson* test. Summers and the Board argue that a ban (as they see it) against telemarketing alone leaves ample alternative channels of communication open to chiropractors.[1] Silverman asserts that a ban reaching (as it does) all forms of solicitation but for the two exceptions is a much broader means than necessary to achieve the state's legitimate ends. We conclude that Silverman's analysis is correct. The best illustration of the overbroad nature of the statute is found in Summers' and the Board's description of the non-telemarketing prohibited conduct; such conduct "seeks to *notify* people about the 'availability and benefits of chiropractic services' and the services he offers, without pressure and persistence" and "*promotes* the 'availability and benefits of chiropractic services' through health fair booths and public speaking engagements." Brief at 10 (emphasis in original).

The Tennessee legislature surely has other, more appropriately tailored means

---

1. In making this argument, Summers and the Board write: "[O]ther manners of solicitation, including targeted direct mailings and written, radio and television advertising are open to chiropractors and specifically allowed under [the statute]." This statement is consistent with a conclusion that solicitation and advertising are not mutually exclusive within section 63–4–114(5).

to achieve its legitimate ends. While it is not our place to suggest legislative language, other courts have expressed approval of narrower limits that establish a moratorium on contacting accident victims for a given time following the accident, or that prohibit contacting recent accident victims as a specific group. *See, e.g., Went For It,* 515 U.S. at 630–33; *Bailey,* 190 F.3d at 325; *Culpepper v. Arkansas Bd. of Chiropractic Exam'rs,* 343 Ark. 467, 36 S.W.3d 335, 341 (Ark.2001). Moreover, we note that the Tennessee legislature imposed criminal sanctions for the violation of section 63–4–114. *See* Tenn.Code Ann. § 63–4–117(a) (1997) ("Any person who violates any provision of this chapter commits a Class B misdemeanor."). Our conclusion that the state must achieve its ends with more precise means is strengthened by the state's decision to treat the proscribed conduct as criminal behavior. *See State v. Bradford,* 787 So.2d 811, 828 (Fla. 2001).

Because section 63–4–114(5) is not sufficiently narrowly tailored, the district court did not err in concluding that Silverman was likely to succeed on the merits of his constitutional challenge. As we have noted before, this is often the determinative factor when a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment because there is an irreparable injury inherent in the loss of First Amendment freedoms. *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir.1998). For this reason, the district court did not err in concluding that Silverman would suffer irreparable injury in the absence of the injunction.

Given the overbroad nature of the statute, we also find no error in the district court's conclusions that the preliminary injunction would neither be of harm to others nor be detrimental to the public interest.

Our holding should not be viewed as approval of the aggressive telemarketing conduct described in the record. If true, it indicates that Silverman's agents were less than truthful in their conversations with recent accident victims and that they exerted pressure on vulnerable people during stressful times. It is likely that much of that conduct would not be entitled to First Amendment protection because it is false and misleading and does not concern lawful activity. *See Ibanez v. Florida Dep't of Bus. and Prof'l Regulation,* 512 U.S. 136, 142, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994); *Central Hudson,* 447 U.S. at 563–64. Moreover, we note that another subpart of section 63–4–114 that is not at issue in this case independently prohibits such conduct. *See* Tenn.Code Ann. § 63–4–114(16) (Supp.2000) (prohibiting chiropractors or their agents from "[m]aking false, fraudulent, misleading, extravagant or grossly improbable claims or statements as to the efficacy or value of the science or practice of chiropractic"). Nevertheless, section 63–4–114(5) sweeps too broadly to be a permissible tool for regulating commercial speech of this kind.

### III.

We affirm the judgment of the district court.